IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 23-1267

_____

SSM LITIGATION GROUP,

*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*

_____

ON PETITION FOR REVIEW OF FINAL AGENCY ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

_____

**PROOF OPENING BRIEF OF PETITIONER SSM LITIGATION GROUP**

_____

<div style="margin-left:50%;">

Russell S. Frye
FryeLaw PLLC
1629 K Street, N.W., Suite 300
Washington, DC 20006-1631
(202) 572-8267
rfrye@fryelaw.com
*Counsel for SSM Litigation
Group*

</div>

Dated:  July 29, 2024

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), undersigned counsel for petitioner SSM Litigation Group hereby submits the following certificate as to parties, rulings, and related cases:

## 1. Parties and *Amici*

The requirement in Circuit Rule 28(a)(l)(A) to identify parties, intervenors, and *amici curiae* that appeared below is inapplicable because this case involves direct review of informal agency rulemaking. The Petitioner is SSM Litigation Group, an *ad hoc*, informal organization of trade associations and business organizations, formed to fund and conduct advocacy and litigation concerning regulation under the Clean Air Act of emissions from stationary sources, with particular emphasis on emissions during startup, shutdown, and malfunction events. The Respondent is the United States Environmental Protection Agency. Intervenors in support of respondent are Sierra Club, Ironbound Community Corporation, California Communities Against Toxics, Environmental Integrity Project, and Natural Resources Defense Council.

## 2. Ruling Under Review

This proceeding involves a petition for review, pursuant to 42 U.S.C. § 7607(b) and Fed. R. App. P. 15(a), of the United States Environmental

Protection Agency's final action: "Removal of Title V Emergency Affirmative Defense Provisions From State Operating Permit Programs and Federal Operating Program," published on July 21, 2023 at 88 Fed. Reg. 47,029.

**3.    Related Cases**

Petitioner is unaware of any other pending petition for review of the rulemaking addressed in this petition for review or any related ongoing litigation.

Dated: July 29, 2024

Respectfully submitted,

/s/ Russell S. Frye
FryeLaw PLLC
1629 K Street, N.W.  Suite 300
Washington, DC  20006-1631
(202) 572-8267
Fax (866) 850-5198
rfrye@fryelaw.com
*Counsel for SSM Litigation Group*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, counsel for petitioner SSM Litigation Group certifies as follows:

1. SSM Litigation Group is an *ad hoc*, informal organization of trade associations and business organizations, formed to fund and conduct advocacy and litigation concerning regulation under the Clean Air Act of emissions from stationary sources, with particular emphasis on emissions during startup, shutdown, and malfunction events.

2. SSM Litigation Group does not have a parent corporation, and no publicly-held company has a 10 percent or greater ownership interest in SSM Litigation Group. SSM Litigation Group is a "trade association" within the meaning of Circuit Rule 26.1(b).

Dated: July 29, 2024                    Respectfully submitted,

/s/ Russell S. Frye
FryeLaw PLLC
1629 K Street, N.W.  Suite 300
Washington, DC  20006-1631
(202) 572-8267
Fax: (866) 850-5198
rfrye@fryelaw.com
*Counsel for SSM Litigation*
*Geoup*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................... iii

TABLE OF CONTENTS...................................................................iv

TABLE OF AUTHORITIES ..........................................................vi

GLOSSARY ..................................................................................xi

JURISDICTIONAL STATEMENT ..................................................1

STATUTES AND REGULATIONS...................................................1

STATEMENT OF ISSUES ..............................................................2

INTRODUCTION ...........................................................................3

STATEMENT OF THE CASE..........................................................4

I.      The Clean Air Act of 1970 and Its Use of Technology-Based Emission Standards. ................................................................4

II.     Operating Permits Under the 1990 Amendments. .........................7

III.    Affirmative Defense Provisions in State Implementation Plans....................8

IV.     The *NRDC* Decision and EPA Actions To Remove Affirmative Defense Provisions from Title V Permits and SIPs. ....................10

STANDARD OF REVIEW ..............................................................13

SUMMARY OF ARGUMENT ........................................................15

ARGUMENT ................................................................................19

I.      The Affirmative Defense Removal Was Based on an Incorrect Interpretation of the CAA...........................................................19

        A.      The Affirmative Defense Removal contradicted decades of EPA legal and policy judgments, based on a new conclusion that the affirmative defense was prohibited by the CAA....................23

        B.      The Title V permit affirmative defense for emergencies was not prohibited by precedent or by the structure of the CAA. .............27

        C.      The Court must vacate an action that EPA mistakenly thought was required by CAA §§ 113 and 304...................30

II.   EPA's Reference to "Consistency" Does Not Justify the
      Affirmative Defense Removal...................................................................33

III.  The Affirmative Defense Removal Was Arbitrary and Capricious. ............35

      A.   The realities of industrial processes and the limitations of
           pollution control technology that warranted the affirmative
           defense have not changed...................................................................36

      B.   The  Affirmative  Defense  Removal  will  not  prevent
           emergencies and their emissions. .......................................................39

      C.   EPA failed adequately to consider the adverse impacts of its
           action. ................................................................................................42

IV.   Reference to the Definition of "Emission Limitation" Does Not
      Justify the Affirmative Defense Removal. ...................................................44

      A.   The Court cannot uphold an EPA action on a rationale that
           EPA said at the time of promulgation did not apply..........................44

      B.   Inconsistency with *Sierra Club* was not the basis for the
           Affirmative Defense Removal. ...........................................................45

      C.   EPA has not demonstrated that *Sierra Club* requires EPA to
           delete the Title V affirmative defense provisions. ...........................48

V.    EPA Failed To Respond Adequately to Public Comments.........................53

CONCLUSION...........................................................................................................55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
      LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE
      STYLE REQUIREMENTS ........................................................................57

CERTIFICATE OF SERVICE ...................................................................................58

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Lung Ass'n v. EPA*, 985 F.3d 914 (D.C. Cir. 2021) ..................31, 33, 34, 56

*Am. Lung Ass'n v. EPA*, 134 F.3d 388 (D.C. Cir. 1998) ......................................9

*Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001) .....................14

*Arizona Pub. Serv. Co. v. EPA*, 562 F.3d 1116 (10th Cir. 2009) ...............10, 25,

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)..................................14

*Business Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011)...........43

*Camp v. Pitts*, 411 U.S. 138 (1973)....................................................................47

*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855 (D.C. Cir 2001) .........20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837
    (1984) ............................................................................................................25

*Corner Post, Inc. v. Board of Governors of the Fed. Reserve Sys.*, 603
    U.S. ___, 144 S. Ct. 2440 (2024) .................................................................56

*Dept. of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. ___, 140 S.
    Ct. 1891 (2020)........................................................................................47, 55

*Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009) ...........................39, 43

*Environmental Committee of the Florida Electric Power Coordinating
    Group, Inc. v. EPA*, 94 F.4th 77

(D.C. Cir. 2024) .......................................9, 11, 13, 25, 27, 30, 31, 34, 38, 50, 51

*Essex Chem. Corp. v. Ruckelshaus,* 486 F.2d 427 (D.C. Cir. 1973) ..................6,

*FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) .........................35

*Kamp v. Hernandez*, 752 F.2d 1444 (9th Cir.1985) ..........................................52

*Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, 144 S. Ct. 2244
    (2024)................................................................... 14, 15, 25, 34, 36, 43, 53

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................18

*Luminant Generation Co. LLC v. EPA,* 714 F.3d 841 (5th Cir. 2013) ....9, 11, 25

*Marathon Oil Co. v. EPA*, 565 F.2d 1253 (9th Cir. 1977) ..................................8

*Michigan v. EPA*, 576 U.S. 743 (2015) ......................................................14, 43

*Military Toxics Project v. EPA*, 146 F.3d 948 (D.C. Cir. 1998) ........................19

*Mingo Logan Coal Co. v. EPA*, 829 F.3d 710 (D.C. Cir. 2016) .......................15

*Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174 (9th Cir. 2012)...........10, 25

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) .......................................................41

*Nat'l Lime Ass'n v. EPA*, 627 F.2d 416 (D.C. Cir. 1980) .................................53

*Natural Res. Def. Council v. EPA*, 859 F.2d 156 (D.C. Cir. 1988)....................20

*Natural Res. Def. Council v. EPA*, 749 F.3d 1055 (D.C. Cir. 2014) .............. 2, 10, 11, 13, 23, 25, 26, 27, 28, 30, 32, 33, 46, 47, 55

*Ohio v. EPA*, 603 U.S. ___, 144 S. Ct. 2040 (2024) ........................14, 35, 36, 54

*Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92 (2015)................................15, 36

*Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C. Cir. 1973) ...5, 6, 20

*Sierra Club v. EPA*, 353 F.3d 976 (D.C. Cir. 2004).............................................6

*Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008).... 44, 45, 46, 49, 50, 51, 52

*Sierra Club v. EPA*, 863 F.3d 834 (D.C. Cir. 2017)...........................................54

*Sierra Club v. EPA*, 884 F.3d 1185 (D.C. Cir. 2018)........................................50

*Sierra Club v. Georgia Power Co.*, 443 F.3d 1346 (11th Cir. 2006)............7, 25

*Sierra Club v. Johnson*, 541 F.3d 1257 (11th Cir. 2008) ..............................7, 48

*Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944)................................................14

*Solite Corp. v. EPA*, 952 F.2d 473 (D.C. Cir. 1991) .........................................35

*Texas v. EPA*, 91 F.4th 280 (5th Cir. 2024).......................................................33

*United States Sugar Corp. v. EPA*, 830 F.3d 579 (D.C. Cir. 2014) ....................................................................15, 24, 25, 39,

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) .............................41

*West Virginia v. EPA*, 597 U.S. 697 (2022) ......................................................31

*West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004) ..............................19

**RULES OF COURT**

Circuit Rule 28(a)(7).........................................................................................18

# FEDERAL STATUTES

Clean Water Act § 402, 33 U.S.C. § 1342 ............................................................. 8,

Clean Air Act, 42 U.S.C. § 7401 *et seq.* .... 3, 4, 14, 15, 16, 17, 18, 24, 26, 30, 47,

Clean Air Act Title V, 42 U.S.C. Chapter 85 Subchapter V ................ 1, 2, 18, 21

Clean Air Act § 108, 42 U.S.C. § 7408 ..................................................................... 8

Clean Air Act § 109, 42 U.S.C. § 7409 ..................................................................... 8

Clean Air Act § 110, 42 U.S.C. § 7410 ..................................................................... 9

Clean Air Act § 110(a), 42 U.S.C. § 7410(a) ......................................................... 52

Clean Air Act § 111, 42 U.S.C. § 7411 ............................................................... 4, 19

Clean Air Act § 111(h), 42 U.S.C. § 7411(h) ........................................................ 50

Clean Air Act § 112, 42 U.S.C. § 7412 ................................................... 6, 23, 48, 49

Clean Air Act § 112(d), 42 U.S.C. § 7412(d) ................................... 6, 10, 26, 51

Clean Air Act § 112(h), 42 U.S.C. § 7412(h) ............................................ 49, 50, 51

Clean Air Act § 113, 42 U.S.C. § 7413 ......................................................... 1, 2, 28

Clean Air Act § 113(b, 42 U.S.C. § 7413 ......................................................... 11, 30,

Clean Air Act § 165(a)(4), 42 U.S.C. § 7475(a)(4) ................................................. 5,

Clean Air Act § 169(3), 42 U.S.C. § 7479(3) ......................................................... 5,

Clean Air Act § 172(c), 42 U.S.C. § 7502(c) ......................................................... 5,

Clean Air Act § 302(k), 42 U.S.C. § 7602(k) .......................... 46, 49, 50, 51, 53

Clean Air Act § 303, 42 U.S.C. § 7603 ................................................................. 41

Clean Air Act § 304, 42 U.S.C. § 7604 ...................................... 1, 2, 23, 28, 30,

Clean Air Act § 304(a), 42 U.S.C. § 7604(a) ................................... 23 should

Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1) ............................................. 1,

Clean Air Act § 307(d)(6)(B), 42 U.S.C. § 7607(d)(6)(B) ......................... 54, 55

Clean Air Act § 307(d)(9), 42 U.S.C. § 7607(d)(9) ........................................... 55

Clean Air Act § 307(d)(9)(A), 42 U.S.C. § 7607(d)(9)(A) ......................... 13, 35

Clean Air Act § 502(b), 42 U.S.C. § 7661a(b) ............................................... 7, 21

Clean Air Act § 502(d)(3), 42 U.S.C. § 7661a(d)(3) ..................................... 7, 21

# FEDERAL REGULATIONS

40 C.F.R. § 60.2 ...............................................................................................20

40 C.F.R. § 60.8(c)......................................................................................5, 20,

40 C.F.R. § 60.11(c) .......................................................................................20

40 C.F.R. pt. 70 ........................................................................................21, 29,

40 C.F.R. § 70.6 ...............................................................................................2,

40 C.F.R. § 70.6(f)(3)(i) ................................................................................41

40 C.F.R. § 70.6(g) ................................................ 8, 21, 22, 29, 32, 37, 56

40 C.F.R. § 70.6(g)(1).............................................................................22, 40,

40 C.F.R. § 70.6(g)(2) ...........................................................................22, 30,

40 C.F.R. § 70.6(g)(3) ...........................................................................40, 51

40 C.F.R. § 70.6(g)(1)-(3) ..........................................................................

40 C.F.R. pt. 71 ........................................................................................21, 28,

40 C.F.R. § 71.6 ...............................................................................2, 21, 29, 56

40 C.F.R. § 71.6(g) ..................................................................................8,  32

# FEDERAL REGISTER NOTICES

37 Fed. Reg. 17,214 (Aug. 18, 1972) ...................................................20

38 Fed Reg. 28,564 (Oct. 15, 1973) .............................................5, 20,

42 Fed. Reg. 57,125 (November 1, 1977) .........................................20,

57 Fed. Reg. 32,250 (July 21, 1992).................. 5, 8, 21, 24, 37, 38,

60 Fed. Reg. 45,530 (August 31, 1995)....................................5, 6, 8,

61 Fed. Reg. 34,202 (July 1, 1996)...................................................21,

75 Fed. Reg. 54,970 (Sept. 9, 2010) ...............................................26

75 Fed. Reg. 68,989 (Nov. 10, 2010) ........................9, 37, 46, 51, 52

78 Fed. Reg. 12,460 (Feb. 22, 2013) .......... 6, 9, 11, 25, 37, 40, 46, 52

79 Fed. Reg. 55,920 (Sept. 17, 2014)  .............. 6, 11, 27, 28, 29, 31, 33, 47,

80 Fed. Reg. 33,840 (June 12, 2015) ...........................................................12, 28,

81 Fed. Reg. 38,645 (June 14, 2016) .............. 11, 12, 23, 24, 26, 27, 28, 33,, 35,

85 Fed. Reg. 7232 (Feb. 7, 2020) .................................................................40

87 Fed. Reg. 19,042 (April 1, 2022) .....................................................12, 33, 35,

88 Fed. Reg. 47,029 (July 21, 2023)

   1, 8, 12, 20, 21, 22, 24, 25, 26, 27, 28, 32, 33, 34, 35, 38, 39, 40, 42,
   43, 44, 45, 46, 48, 51, 54, 55

## STATE REGULATIONS

Arkansas Pollution Control and Ecology Commission Regulation 19.602 .29, 30

## LEGISLATIVE MATERIALS

Clean Air Act Amendments of 1970, Pub. L. No. 91-604 ......................4, 19, 20,

Clean Air Act Amendments of 1990, Pub. L. 101-549 ............................6, 7, 15,

# GLOSSARY

| | |
|---|---|
| **the Affirmative Defense Removal** | EPA's action, published July 21, 2023 at 88 Fed. Reg. 47,029, removing an affirmative defense for emergencies from regulations on Title V permitting programs, and directing states to revise their regulations and individual Title V permits to delete the affirmative defense |
| **the Agency** | The United States Environmental Protection Agency |
| **CAA, or the Act** | Clean Air Act, 42 U.S.C. § 7401 *et seq.* |
| **EPA** | The United States Environmental Protection Agency |
| | Federal Implementation Plan adopted by EPA pursuant to CAA § 110(c) |
| **JA** | Joint Appendix in this case |
| **SIP** | State Implementation Plan adopted by a state and approved by EPA pursuant to CAA § 110(a) |
| **SIP call** | EPA determination that an existing, approved SIP is substantially inadequate and requiring the state to submit a revised SIP to EPA for approval, under CAA § 110(k)(5) |
| **SSM** | Startup, shutdown, or malfunction of a stationary source of air pollutants |
| **SSM SIP Call Rule** | Findings of Substantial Inadequacy of State Implementation Plans and SIP Calls to Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown, and Malfunction, published at 80 Fed. Reg. 33,840 (June 12, 2015) |

**Title V permit**          Operating permit for a stationary source of air
                            pollutants, issued by an approved state program or
                            by EPA, pursuant to CAA Title V, 42 U.S.C.
                            Chapter 85 Subchapter V

## JURISDICTIONAL STATEMENT

This petition seeks judicial review of the Environmental Protection Agency's ("EPA's") final action, entitled *Removal of Title V Emergency Affirmative Defense Provisions From State Operating Permit Programs and Federal Operating Permit Program*, published at 88 Fed. Reg. 47,029 (July 21, 2023), removing a provision in EPA regulations governing state programs for issuance of operating permits under Title V of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. Chapter 85 Subchapter V, and removing an identical provision in EPA regulations governing Title V permits when EPA is the permitting authority, as well as the related statutory interpretations and directives for future state and EPA action contained therein (the "Affirmative Defense Removal"). The Court has jurisdiction under CAA § 307(b)(1). Petitioner is an *ad hoc* association of trade associations and business organizations whose members will be subject to increased potential liability under CAA §§ 113 and 304 as a result of the challenged EPA action. The petition for review was timely filed under CAA § 307(b)(1) on September 19, 2023.

## STATUTES AND REGULATIONS

This petition pertains to conditions in operating permits for stationary sources of air pollutants issued under CAA Title V, specified in EPA regulations

at 40 C.F.R. §§ 70.6 and 71.6.  The EPA action addressed in this petition is based on EPA's interpretation of provisions for federal district court enforcement of permit conditions and citizen suits under CAA §§ 113 and 304, respectively.  A separately-bound Addendum reproduces pertinent portions of the CAA and cited regulations.  (The two provisions whose removal is challenged in this petition, former subsections 70.6(g) and 71.6(g) of 40 C.F.R., are contained in the Addendum, because the current version of the C.F.R. pre-dates the Affirmative Defense Removal.)

For simplicity, this brief references sections of the Clean Air Act.  Parallel U.S. Code citations can be found in the Table of Authorities.

## STATEMENT OF ISSUES

1. Whether EPA's promulgation of the Affirmative Defense Removal was based on an inaccurate interpretation of the implications of this Court's opinion in *NRDC v. EPA*, 749 F.3d 1055 (D.C. Cir. 2014).

2. Whether EPA's promulgation of the Affirmative Defense Removal was arbitrary, capricious, and an abuse of discretion because EPA failed to provide an adequate justification for its reversal of its longstanding prior determination that it was both legally permissible and appropriate as a matter of policy to allow an affirmative defense for excess emissions caused by emergencies in Clean Air Act Title V operating permits.

3. Whether EPA's promulgation of the Affirmative Defense Removal was arbitrary, capricious, and an abuse of discretion because EPA failed adequately, if at all, to consider the costs and benefits of requiring states and EPA regions to remove an operating permit provision that only protects source operators to CAA liability for emissions that are "unavoidable" despite operation of appropriate pollution control technology and that arise "from sudden and reasonably unforeseeable events beyond the control of the source, including acts of God."

4. Whether EPA's promulgation of the Affirmative Defense Removal was arbitrary, capricious, and an abuse of discretion because EPA failed to respond substantively to significant public comments.

## INTRODUCTION

A key feature of the federal Clean Air Act, 42 U.S.C. § 7401 *et seq*., ("CAA") is its reliance, in significant part, on emission limitations that are based on what can be achieved with available pollution control technology. For over 30 years, EPA regulations allowed CAA operating permits to contain a provision, giving the permittee an affirmative defense to liability for violations of technology-based emission limitations that occurred as a result of an emergency.

This petition for review challenges EPA's decision in 2023 to remove that affirmative defense from EPA and state permitting regulations and from individual operating permits. EPA still acknowledges that punishing a facility for an event beyond the capability of pollution control technology may be inappropriate, but the Agency insists that any affirmative defense provision is contrary to the structure of the CAA. That interpretation has been rejected by this Court in another CAA case earlier this year, so EPA's decision to remove the affirmative defense for emergencies must be vacated and remanded.

## STATEMENT OF THE CASE

### I. The Clean Air Act of 1970 and Its Use of Technology-Based Emission Standards.

A critical feature of the seminal Clean Air Act Amendments of 1970, Pub. L. No. 91-604, was inclusion of various types of emission standards that would be based on what can be achieved with available technology. These technology-based standards were seen as a more efficient way of ensuring improvements in air quality than just relying on emissions limits for individual sources calculated to ensure their contribution to ambient air quality would not exceed standards for air quality necessary to protect health and welfare. For example, New Source Performance Standards under CAA § 111 would require new and modified sources to use the best emissions reduction technology. Subsequent

amendments to the Act expanded on technology-based requirements, such as reasonably available control technology ("RACT") for sources in areas not attaining ambient air quality standards, under CAA § 172(c), and best available control technology ("BACT") for major new and modified sources, under CAA §§ 165(a)(4) and 169(3).[1]

Early on, both EPA and the courts recognized that inherent in the concept of technology-based standards was the notion that there may be certain periods when, despite a source's use of appropriate technology and proper operation and maintenance, there could be periods where the technology was incapable of meeting emission limitations based on normal operations, and it would be unfair to penalize the source operator for circumstances beyond its control. *See*, *e.g.*, 40 C.F.R. § 60.8(c); 38 Fed Reg. 28,564, 28,565 (Oct. 15, 1973) ("Sources which ordinarily comply with the standards may during periods of startup, shutdown, or malfunction unavoidably release pollutants in excess of the standards," so compliance is to be determined through testing under

---

[1] EPA explained the difference between health-based standards (for which EPA traditionally has not permitted relief for exceedances caused by the limitations of technology) and technology-based standards at 57 Fed. Reg. 32,250, 32,279 (July 21, 1992) and 60 Fed. Reg. 45,530, 45,559 n.7 (August 31, 1995). *See also Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 387 n.47 (D.C. Cir. 1973) (explaining that Congress rejected the idea that EPA should require "the most advanced technology regardless of whether or not a particular industry finds it economically feasible").

representative conditions); 78 Fed. Reg. 12,460, 12,469-70 (Feb. 22, 2013) (EPA "has long recognized that there may be limited circumstances in which excess emissions are entirely beyond the control of the owner or operator" and "there is…case law indicating that technology-based standards should account for the practical realities of technology."); *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d at 398; *Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 433 (D.C. Cir. 1973) (provisions to account for upsets "appear necessary to preserve the reasonableness of the standards as a whole").

Again, in the 1990 amendments to the CAA, Pub. L. 101-549, Congress turned to a technology-based approach for (initial) emission limitations for hazardous air pollutants, requiring EPA to develop emission standards for categories of sources of hazardous air pollutants based on the maximum achievable control technology, under CAA § 112(d), after a risk-based approach had proven ineffective.[2]

---

[2] *Sierra Club v. EPA*, 353 F.3d 976, 979-80, 990 (D.C. Cir. 2004); 60 Fed. Reg. at 45,559 (explaining how, before passage of the 1990 CAA Amendments, EPA did not provide relief for malfunctions or emergencies for hazardous pollutant emission standards issued under the previous version of CAA § 112, because those standards were based on the level of emissions from a source that would provide ample protection of public health, being "formulated largely without regard to the limits of technology.").

## II.    Operating Permits Under the 1990 Amendments.

The Clean Air Act amendments of 1990 included a major new program, under which states and, in some instances, EPA, issue operating permits for major stationary sources.  CAA Title V, 42 U.S.C. Chapter 85 Subchapter V.  Those "Title V permits" are intended to bring together into one document all of the applicable federally required emission limitations, work practice standards, monitoring provisions, and recordkeeping and reporting requirements for a facility into one document.  *See*, generally, *Sierra Club v. Johnson*, 541 F.3d 1257, 1260-61 (11th Cir. 2008).  Title V permits are not supposed to impose any new substantive requirements but can include requirements designed to ensure compliance with other applicable requirements.  *Sierra Club v. Georgia Power Co.*, 443 F.3d 1346, 1348-49 (11th Cir. 2006).

Congress directed EPA to adopt regulations for states to develop and EPA to approve a program under which the state issues and EPA reviews operating permits for major stationary sources, and for EPA to issue operating permits itself under certain circumstances, pursuant to CAA §§ 502(b) & 502(d)(3).  When it adopted those Title V permitting regulations, EPA decided it would be appropriate to include a provision providing the permittee with relief from CAA liability when the permittee exceeded technology-based emission limitations as a result of an "emergency" and took various steps in response.  That relief was

in the form of "an affirmative defense to an action brought for noncompliance with such technology-based emission limitations" that the permittee had the burden of raising and proving. 40 C.F.R. § 70.6(g), adopted 57 Fed. Reg. 32,250, 32,306 (July 21, 1992) (state permits); 40 C.F.R. § 71.6(g), adopted 61 Fed. Reg. 34,202, 34,239 (July 1, 1996) (federal permits); together, "the affirmative defense provisions."[3] EPA explained that, by "technology-based standards," it meant: "those standards the stringency of which are based on determinations of what is technologically feasible, considering relevant factors." 60 Fed. Reg. at 45,559 n.7.

## III.   Affirmative Defense Provisions in State Implementation Plans.

The CAA establishes a program for improving air quality that strictly divides responsibility between EPA and the states. EPA sets National Ambient Air Quality Standards that specify maximum acceptable ambient concentrations of pollutants. CAA §§ 108-109. States, however, bear primary responsibility

---

[3] Although the scope of the Title V affirmative defense for emergencies was narrower than the typical definition of the malfunctions that EPA addressed in other regulations (*see* 88 Fed. Reg. at 47,040-41), EPA based the affirmative defense on its interpretation of the need for technology-based standards to address unavoidable emissions due to malfunctions in process or pollution control technology (*see* 57 Fed. Reg. at 32,279) and a similar defense for "upsets" causing exceedances of technology-based effluent limitations that EPA had included in its regulations for issuance of discharge permits under section 402 of the Clean Water Act. *Id.*, *citing Marathon Oil Co. v. EPA*, 565 F.2d 1253, 1273 (9th Cir. 1977).

for attaining, maintaining, and enforcing these standards through development and implementation of State Implementation Plans ("SIPs") under CAA § 110. *See, e.g., Environmental Committee of the Florida Electric Power Coordinating Group, Inc. v. EPA*, 94 F.4th 77, 84-86 (D.C. Cir. 2024) (the "*SSM SIP Call Decision*"); *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998). If EPA has approved a SIP but later concludes that the SIP is substantially inadequate to meet ambient air quality standards and other requirements of the CAA, EPA can issue a "SIP call" requiring the state to revise its SIP, and EPA eventually can issue a Federal Implementation Plan ("FIP") if the state fails to do so. *SSM SIP Call Decision*, 94 F.4th at 84-86.

From the outset, many SIPs provided certain relief for sources unable to comply with technology-based emission limitations due to malfunctions (defined as infrequent and unanticipated failures of equipment to operate as intended, not resulting from improper equipment designed or negligent operation and maintenance). For many years, EPA encouraged states to address such situations through inclusion in the SIP of an "affirmative defense." *See, e.g.*, 75 Fed. Reg. 68,989, 68,992-93 (Nov. 10, 2010); 78 Fed. Reg. at 12,470-71. EPA defended such affirmative defense provisions when EPA approved them in SIPs or included them in FIPs. *See, e.g., Luminant Generation Co. LLC v. EPA*, 714 F.3d 841 (5th Cir. 2013) ("*Luminant*") (rejecting environmental

9

groups' claims that, *inter alia*, the affirmative defense in the EPA-approved Texas SIP improperly interfered with the district courts' role in determining appropriate civil penalties); *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1192-93 (9th Cir. 2012); *Arizona Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1129-30 (10th Cir. 2009).

## IV. The *NRDC* Decision and EPA Actions To Remove Affirmative Defense Provisions from Title V Permits and SIPs.

In 2014, this Court vacated an affirmative defense to civil penalties for excess emissions resulting from malfunctions that EPA had included in hazardous air pollutant emission standards for Portland Cement plants issued under CAA § 112(d). *Natural Res. Def. Council v. EPA*, 749 F.3d 1055, 1062-64 (D.C. Cir. 2014) ("*NRDC*"). The Court's rationale was that, once EPA determined the appropriate emission standards, the Agency could not dictate circumstances under which a civil penalty would not be imposed for a violation of the standards, because the CAA gives the district courts the authority to determine an appropriate civil penalty in citizen suit enforcement actions. *Id*. at 1063. Notably, the *NRDC* opinion recognized that the Fifth Circuit had previously determined that an affirmative defense for malfunctions in the Texas SIP was not prohibited by the CAA, and the Court was not confronting the question whether an affirmative defense may be appropriate in a SIP. *Id*. at

1064 n.2; *cf. Luminant*, 714 F.3d at 853 n.9 ("the availability of the affirmative

defense does not negate the district court's jurisdiction to assess civil penalties

using the criteria outlined in section 7413(e), or the state permitting authority's

power to recover civil penalties").

Although EPA had rejected, in 2013, Sierra Club's request that EPA issue

SIP calls for affirmative defense provisions in numerous SIPs, alleging that

affirmative defenses improperly interfere with the District Courts' authority to

determine appropriate civil penalties (*see* 78 Fed. Reg. at 12,468-72), and

despite the *NRDC* opinion's statement that it was not addressing the

appropriateness of affirmative defense provisions in SIPs, shortly after the

Court's decision in *NRDC*, EPA reversed position and proposed to issue SIP

calls on that basis.  79 Fed. Reg. 55,920, 55,924-25, 55,934-35 (Sept. 17, 2014);

*SSM SIP Call Decision*, 94 F.4th at 87.

Subsequently, EPA also proposed to remove the "emergencies"

affirmative defense provisions from the Title V regulations.  81 Fed. Reg.

38,645 (June 14, 2016).  EPA's justification for that proposed action was EPA's

interpretation of the *NRDC* decision as applying equally to any similar

affirmative defense provision and, therefore, establishing that the Title V

affirmative defense provisions "interfere with the authority of courts to assess

penalties or to impose other remedies authorized in CAA section 113(b) in civil

enforcement suits." 81 Fed. Reg. at 38,648. EPA relied heavily on its analysis in the SSM SIP Call rulemaking. *Id.* EPA did not take final action on this proposed rule for a number of years, so the Agency issued a brief re-proposal on April 1, 2022, 87 Fed. Reg. 19,042.[4]

EPA took final action to remove the affirmative defense for emergencies that had been contained in 40 C.F.R. §§ 70.6(g) and 71.6(g) on July 21, 2023, 88 Fed. Reg. 47,029 (the "Affirmative Defense Removal"). That Federal Register notice also explained that the deletion of the affirmative defense provisions would require states that included such an affirmative defense in their state permitting programs to submit revised state programs to EPA for approval, and that individual Title V permits containing an affirmative defense provision would need to be modified to delete that provision. 88 Fed. Reg. at 47,046-52. SSM Litigation Group filed a timely petition for review.

When EPA issued final SIP calls for affirmative defense provisions in numerous states' SIPs, 80 Fed. Reg. 33,840, 33,851-52 (June 12, 2015), SSM

---

[4] In fact, during that gap EPA even returned to its position that affirmative defense provisions could be included in SIPs, reinstating that interpretation in 2020, and then reversed course yet again and re-adopted the position that affirmative defenses are contrary to the CAA's enforcement provisions in September 2021. *See* 88 Fed. Reg. at 47,038; Memorandum: Inclusion of Provisions Governing Periods of Startup, Shutdown, and Malfunctions in State Implementation Plans, Oct. 9, 2020, *available at* https://www.epa.gov/system/files/documents/2021-09/2020-ssm-in-sips-guidance-memo.pdf, pp.7-10.

Litigation Group and numerous other industry groups and states filed a petition for review. This Court rejected EPA's assertion that SIP affirmative defense provisions that apply to liability under the CAA generally (as opposed to those that only provide an affirmative defense to civil penalties) violate the enforcement structure of the Act, as interpreted by *NRDC*, and vacated the SIP calls EPA had issued for those types of affirmative defense provisions. *SSM SIP Call Decision*, 94 F.4th at 98, 114-16.

Despite the fact that the *SSM SIP Call Decision* rejected the Agency's interpretation of the CAA's enforcement authorities on which EPA based the Affirmative Defense Removal (and the Court even cited, as an example of an affirmative defense that does not violate the CAA, the same state regulation that EPA used in the Affirmative Defense Removal preamble as an example of a supposedly unlawful affirmative defense provision), EPA declined SSM Litigation Group's request that EPA withdraw and reconsider the Affirmative Defense Removal.

## STANDARD OF REVIEW

This Court must set aside final EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; …in excess of statutory jurisdiction, authority, or limitations, or short of statutory right…." CAA § 307(d)(9). EPA's power is limited to the authority delegated by

Congress. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). A reviewing court must use its best judgment to determine the scope of EPA's authority under the terms of the statute, using traditional tools of statutory construction. *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, 144 S. Ct. 2244, 2266 (2024) ("*Loper Bright*"). An agency's own interpretation of its statutory authority can help inform the Court's analysis of the agency's statutory authority, depending on such factors as "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade,…" *Loper Bright*, 144 S. Ct. at 2259, quoting *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944).

Not only must an agency's action be within the boundaries of the authority to act that Congress delegated to it, but the agency must engage in reasoned decisionmaking that produces a logical and rational result. *Loper Bright*, 144 S. Ct. at 2263; *Michigan v. EPA*, 576 U.S. 743, 750 (2015). EPA's action is arbitrary and capricious if the Agency fails to examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Ohio v. Environmental Protection Agency*, 603 U.S. ___, 144 S. Ct. 2040, 2053 (2024) ("*Ohio v. EPA*"); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1053-55,

1059 (D.C. Cir. 2001). Where, as here, an agency reverses a prior determination, particularly a longstanding one, the agency must provide a detailed, satisfactory explanation for its departure, especially in terms of contradictory factual determinations. *See, e.g., Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 106 (2015); *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718-19 (D.C. Cir. 2016); *United States Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2014) ("*US Sugar*").[5]

## SUMMARY OF ARGUMENT

For over 40 years, EPA took the position that, where Congress has chosen in the Clean Air Act ("CAA") to impose limitations on emissions of air pollutants based on the capability of available technology, it is appropriate for requirements under the CAA somehow to recognize the limitations of even properly designed and operated technology during unusual events, so as not to penalize emission source operators unfairly for circumstances beyond their control. Numerous courts have agreed. Accordingly, when Congress in 1990 directed EPA to develop regulations for a new CAA operating permit program, EPA included provisions allowing an operator to assert an affirmative defense to

_____

[5] Court decisions in recent years suggesting that an agency can adopt a contrary interpretation of its statutory authority without facing heightened scrutiny appear no longer to be good law in light of *Loper Bright*, 144 S. Ct. at 2271-72; *id.* at 2282 (Gorsuch, J., concurring).

liability for exceeding a technology-based emission limitation as a result of an "emergency."

In the challenged rulemaking, EPA deleted those affirmative defense provisions from its permitting regulations and directed states and EPA regional offices to remove affirmative defense provisions in existing operating permits. This abrupt about-face did not reflect a change in EPA's longstanding understanding of the implications of the limitations inherent in technology-based emissions standards. Rather, it was based on EPA's interpretation of this Court's opinion rejecting an affirmative defense to civil penalties contained in an EPA emission standard for hazardous air pollutant emissions from cement kilns, on the grounds that such affirmative defense improperly interfered with the authority of district courts to decide on appropriate civil penalties, once a violation of an emissions standard occurs and a citizen enforcement suit is brought.

EPA's new interpretation was rejected in this Court's March 1, 2024, decision, in a case concerning EPA's demands that numerous states remove affirmative defense provisions from their CAA State Implementation Plans. In fact, the Court used, as an example of an affirmative defense provision that does not run afoul of the CAA's enforcement structure, a state regulation that is virtually identical to the affirmative defense provisions that EPA recently

deleted from its operating permit regulations based on its conclusion that they were contrary to the Act's structure. EPA's deletion of affirmative defense provisions in this case must therefore be vacated, just as the Court vacated EPA's improper demands that states remove comparable affirmative defense provisions from their State Implementation Plans.

While EPA's incorrect interpretation of the statute as prohibiting the affirmative defense provisions in CAA operating permits is dispositive, EPA also: failed to show why its recent interpretation that such affirmative defense provisions are inappropriate is better than the interpretation EPA applied soon after the statute was enacted and for decades thereafter; acted in an arbitrary and capricious manner by imposing a regulatory burden without assessing the costs and knowing that little, if any, benefit would result; and failed to respond to significant comments as the CAA requires.

The Court cannot uphold EPA's action on the basis of an alternative justification – that an affirmative defense to liability for a violation of an emission limitation unlawfully renders emission limitations non-continuous – when EPA said at the time of its action that that justification did not apply, and it was not the trigger for EPA reversing its longstanding position that affirmative defense provisions are lawful and appropriate. And even if EPA had removed the affirmative defense provisions from its permitting regulations because the

Agency concluded they were impermissible because the CAA requires emission limitations to be continuous, that departure from EPA's longstanding interpretation of the CAA to the contrary would be unjustified and would not reflect the best reading of the statute, as applied to the facts.

## STANDING

Petitioner is an *ad hoc* coalition of trade associations and business organizations whose members operate stationary sources of air pollution subject to operating permits issued under CAA Title V. Those members were protected from liability for certain excess emissions that they may experience associated with "emergencies," under an affirmative defense provision that EPA regulations allowed in state or federal Title V permits.[6] The members of the associations comprising Petitioner SSM Litigation Group have standing in their own right because they have suffered injury-in-fact that is redressable by the relief they seek: restoration of the affirmative defense for emergencies that the challenged EPA action would remove. *Lujan v. Defenders of Wildlife*, 504 U.S.

---

[6] *See* public comments explaining how emergencies can prevent compliance with permit limitations despite proper operation of the source, e.g.: The Vinyl Institute (May 16, 2022) at 3-4 (JA___-___) (retaining affirmative defense "would allow facilities to focus on the safety of the plant and its personnel" during emergency events); Ohio Chemistry Technology Council *et al*. (Aug. 15, 2016) at 1-2 (JA___-___); NEDA/CAP (Aug. 15, 2016) at 1-2 (JA___-___); SSM Coalition (May 16, 2022) at 1-2, 17 (JA___-___, JA___); Circuit Rule 28(a)(7) (petitioner's standing can be apparent from the administrative record).

555, 560-62 (1992); *see also, e.g.*, *West Virginia v. EPA*, 362 F.3d 861, 868

(D.C. Cir. 2004).  The trade associations that have joined together to form SSM

Litigation Group have standing to bring this case to secure that relief on behalf

of their aggrieved members.  *Military Toxics Project v. EPA,* 146 F.3d 948, 953-

54 (D.C. Cir. 1998).

## ARGUMENT

I.      **The Affirmative Defense Removal Was Based on an Incorrect
        Interpretation of the CAA.**

As explained in the Statement of the Case, pp.4-6, *supra*, a key aspect of

the Clean Air Act Amendments of 1970 was Congress's determination that, in

many cases, the most effective approach to improving and maintaining air

quality would be to require industrial facilities and other sources of air pollution

to comply with emission limitations based on what can be achieved with

available technology.  Consistent with that Congressional purpose, EPA,

virtually as soon as it started implementing the 1970 CAA, began to adopt rules

and policies that recognized that even the best process and pollution control

technology, properly maintained and operated, will be unable in some situations

to achieve emission limitations based on the performance of that technology.[7]

_____

[7] For example, early-on in adopting emission standards for new sources under
CAA § 111, EPA promulgated a regulation specifying that: "Operations during
periods of startup, shutdown, and malfunction shall not constitute representative

In numerous CAA contexts, over the first 45 years of implementing the Clean Air Act Amendments of 1970, *see* pp. 4-8, *supra*, EPA's position was that, because even the best technology would in some limited circumstances be unable to meet emission limitations that were established based on the performance of that technology during normal operations, it would be unfair and contrary to Congress's intent in providing for technology-based emission limitations to penalize a source operator for excess emissions beyond the capability of available technology. The courts agreed.[8]

---

conditions for the purpose of a performance test nor shall emissions in excess of the level of the applicable emission limit during periods of startup, shutdown, and malfunction be considered a violation of the applicable emission limit unless otherwise specified in the applicable standard." 40 C.F.R. § 60.8(c), adopted at 42 Fed. Reg. 57,125 (November 1, 1977) ("simply clarify[ing] the existing regulations" that, since 1973, had stated that compliance with numerical emission limits could not be determined during periods of startup, shutdown, and malfunction [*see* 38 Fed Reg. 28,564 (Oct. 15, 1973)]); *id.* at 28,566 (adopting 40 C.F.R. § 60.11(c) (opacity standards for new sources do not apply "during periods of…malfunction")) *See also* 37 Fed. Reg. 17,214 (Aug. 18, 1972). "Malfunction" was defined as: "any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions." 40 C.F.R. § 60.2, adopted 38 Fed. Reg. at 28,565. Those rules are still on the books today.

[8] *See*, *e.g.*, *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d at 398-99; *Natural Res. Def. Council v. EPA*, 859 F.2d 156, 208 (D.C. Cir. 1988) (a "technology based standard discards its fundamental premise when it ignores the limits inherent in technology."). *See also Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 872 (D.C. Cir 2001) (expressing "doubts about EPA's decision to

When Congress directed EPA, in Title V of the 1990 CAA Amendments, to adopt regulations for states to issue and EPA to review operating permits for major stationary sources, and for EPA to issue operating permits itself under certain circumstances, pursuant to CAA §§ 502(b) & 502(d)(3), EPA decided it would be appropriate to include a provision providing the permittee with relief from CAA liability when the permittee exceeded technology-based emission limitations as a result of an "emergency."  That relief was in the form of "an affirmative defense to an action brought for noncompliance with such technology-based emission limitations" that the permittee had the burden of raising and proving.  40 C.F.R. § 70.6(g), adopted 57 Fed. Reg. 32,250, 32,306 (July 21, 1992) (state permits); 40 C.F.R. § 71.6(g), adopted 61 Fed. Reg. 34,202, 34,239 (July 1, 1996) (federal permits); together, "the affirmative defense provisions."[9]  The affirmative defense provisions remained unchanged until EPA issued the Affirmative Defense Removal (the subject of this petition for review) on July 21, 2023, 88 Fed. Reg. 47,029.

---

require sources to comply with standards even during openings of emergency safety valves caused by events beyond the sources' control.").

[9] Because the affirmative defense provisions in the 40 C.F.R. pt. 70 rules for state operating permit programs and the 40 C.F.R. pt. 71 rules for EPA-issued operating permits, and EPA's justification for removing them, are the same, this brief generally refers to 40 C.F.R. § 70.6(g), without including a citation to the essentially identical § 71.6(g).

Although the situations that would qualify for the Title V permit's affirmative defense usually would also fall within the definition of a "malfunction," for which EPA has provided relief in various other regulations, the Title V affirmative defense was somewhat narrower.  88 Fed. Reg. at 47,040. The affirmative defense provisions only applied to unavoidable increases in emissions that were caused by an emergency.  40 C.F.R. § 70.6(g) (2013).  An emergency was defined as "any situation arising from sudden and reasonably unforeseeable events beyond the control of the source, including acts of God, which situation requires immediate corrective action to restore normal operation, and that causes the source to exceed a technology-based emission limitation under the permit…." *Id.* § 70.6(g)(1).

The affirmative defense was only available if the source operator (a) provides notice of the excess emissions to the permitting authority within two working days, describing the emergency, "any steps taken to mitigate emissions, and corrective actions taken" and (b) "can identify the cause(s) of the emergency." *Id.* § 70.6(g)(2).  Importantly, the source operator had to be able to demonstrate, "through properly signed, contemporaneous operating logs, or other relevant evidence," that the "permitted facility was at the time being properly operated," and "[d]uring the period of the emergency the permittee

took all reasonable steps to minimize levels of emissions that exceeded the emission standards, or other requirements in the permit." *Id.*

### A. The Affirmative Defense Removal contradicted decades of EPA legal and policy judgments, based on a new conclusion that the affirmative defense was prohibited by the CAA.

EPA's decision to remove the affirmative defense provisions was triggered by this Court's opinion in a case concerning whether EPA, in promulgating national emission standards for hazardous air pollutants for the Portland Cement source category, could include in those standards an affirmative defense for a violation of the emission standards that results from a malfunction. *See* 81 Fed. Reg. at 38,648-50. That case did not address anything other than whether EPA could include, in hazardous air pollutant emission standards for a source category issued under CAA § 112, an affirmative defense to civil penalties for emissions determined to be a violation of those standards. *See NRDC*, 749 F.3d at 1062-64. In particular, *NRDC* held that the affirmative defense in hazardous air pollutant standards for Portland Cement plants was contrary to the CAA's provision authorizing enforcement through citizen suits, § 304(a). *NRDC*, 749 F.3d at 1062-64. In fact, the Court specifically noted that the opinion was not addressing whether an affirmative defense may be appropriate in a State Implementation Plan (which the Fifth Circuit had held it was). *Id*. at 1064 n.2.

EPA admits that the CAA does not speak one way or the other on whether EPA can include an affirmative defense provision in the Title V permitting regulations. 88 Fed. Reg. at 47,040. EPA acknowledges that the practical considerations that led the Agency to adopt the affirmative defense provisions in the initial Title V regulations and to approve countless Title V permits containing affirmative defense provisions during the past 30-plus years – unavoidability of some exceedances even with the appropriate technology and proper operation and maintenance – remain. *See* 57 Fed. Reg. at 32,279; 88 Fed. Reg. at 47,038 (the Affirmative Defense Removal "does not change the general recognition" that "even well-designed and appropriately operated equipment may sometimes fail due to circumstances beyond the control of the source (such as during emergencies)," and "EPA continues to believe that enforcement may not be warranted under certain specific circumstances, such as during an emergency"); *see also US Sugar*, 830 F.3d at 606.

EPA recognizes that the Agency's rationale for including the affirmative defense for emergencies in the Title V regulations is similar to its past rationale for allowing the broader affirmative defense for malfunctions in SIPs, *see* 81 Fed. Reg. at 38,650, and admits that every court that has looked at the question has approved inclusion of an affirmative defense for malfunctions in an EPA-

approved SIP or an EPA-issued FIP. *See* 78 Fed. Reg. at 12,470[10]; *see also* 88 Fed. Reg. at 47,037. *See also Sierra Club v. Georgia Power*, 443 F.3d at 1351-53, 1357 (allowing permittee to assert an affirmative defense contained in its Title V permit, over Sierra Club's objection).

Despite all that, EPA reversed its 30-year-plus position that an affirmative defense for emergencies in Title V permits was not only legally permissible, but was appropriate as a matter of policy – not because EPA decided the affirmative defense provisions were a bad idea, but because it concluded, based on *NRDC*[11],

_____

[10] EPA cited *Luminant*, 714 F.3d 841; *Mont. Sulphur*, 666 F.3d 1174, 1192-93 (an affirmative defense is a reasonable way to "compensate for the infeasibility problem"); *Arizona Pub. Serv.*, 562 F.3d 1116, 1129-30 (the defense was based on "an adequate rationale" and "a reasonable interpretation of the [CAA]"). Now, in addition, with respect to affirmative defenses that cover all liability under the CAA, we have this Court's *SSM SIP Call Decision*, 94 F.4th at 98, 114-16.

[11] EPA also asserted that *NRDC*'s conclusion about the inconsistency of affirmative defense provisions [in categorical emission standards issued by EPA] with CAA enforcement provisions was "reaffirmed" by *US Sugar*, 830 F.3d 579, and that the *US Sugar* court "stated" that the affirmative defense provision in hazardous pollutant emission standards for Portland cement plants was "an impermissible intrusion on the judiciary's role." 88 Fed. Reg. at 47,032; *id*. at 47,037. That EPA statement is misleading. The *US Sugar* court was merely recounting the holding of another case, not reaffirming it or reaching an independent conclusion. *See* 830 F.3d at 607. (Additionally, *US Sugar*'s assessment of EPA's approach of declining to adopt an affirmative defense or alternative standard for malfunctions was based on deference to EPA's reading of the statute, under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *see* 830 F.3d at 608, and *Chevron* has been overruled by *Loper Bright*, 144 S. Ct. at 2273.)

that they are not appropriate under the CAA and are inconsistent with the Act's enforcement structure. *See*, *e.g.*, 88 Fed. Reg. at 47,031 (preamble "discusses the legal basis for this action in light of the *NRDC* decision"); *id.* at 47,037 (EPA has reevaluated its interpretation of the CAA because of *NRDC* and "[b]ased on this reevaluation and the reasoning of the *NRDC* decision the EPA has determined that it is appropriate to remove the emergency affirmative defense provisions...because these provisions are not authorized by the CAA"); *id.* at 47,038 ("The EPA has clearly articulated its revised interpretation of the CAA with respect to affirmative defenses… based on the EPA's analysis of the *NRDC* decision."); *id* at 47,046 (EPA's action is based solely on EPA's new interpretation of the enforcement structure of the CAA, and not on any benefits of removing the affirmative defense provisions); 81 Fed. Reg. at 38,650.

Although *NRDC* only addressed an affirmative defense to civil penalties for an "exceedance," due to a malfunction, of an emission standard for hazardous air pollutants that EPA had established under the strict requirements of CAA § 112(d) (*see NRDC*, 749 F.3d at 1057; 75 Fed. Reg. 54,970, 55,053 (Sept. 9, 2010)), EPA extrapolated greatly to conclude that all types of "affirmative defense provisions…are not appropriate under the CAA, no matter what type of event they apply to, what criteria they contain, or what forms of

26

remedy they purport to limit or eliminate." 81 Fed. Reg. at 38,650; 88 Fed. Reg. at 47,044.

EPA's application of the CAA to the Title V affirmative defense provisions in light of *NRDC* not only was not compelled, it was wrong, as this Court's March 1, 2024, opinion in the *SSM SIP Call Decision* makes abundantly clear.

## B. The Title V permit affirmative defense for emergencies was not prohibited by precedent or by the structure of the CAA.

The Affirmative Defense Removal is not the first rulemaking in which EPA suddenly reversed decades of interpreting the CAA to allow and support use of an affirmative defense to address unanticipated and not reasonably avoidable excess emissions associated with failure of process or pollution control technology to operate as intended, based on the *NRDC* decision. As explained further at pp. 10-13, *supra*, just months after *NRDC* was decided, EPA reversed the longstanding position it had just defended the year before, that affirmative defense provisions were an acceptable and appropriate way to address "malfunctions" in State Implementation Plans. *See* 79 Fed. Reg. 55,920 (Sept. 17, 2014). There, as in the Affirmative Defense Removal, EPA interpreted *NRDC* as precluding any sort of affirmative defense provision in SIPs, because such an affirmative defense would interfere with the district

27

courts' authority under CAA §§ 113 and 304 to determine appropriate penalties in enforcement actions and citizen suits.  *See* 79 Fed. Reg. at 55,935.

EPA followed that interpretation when it promulgated its final rule issuing SIP calls to numerous states because their SIPs contained an affirmative defense for certain kinds of malfunctions.  80 Fed. Reg. at 33,851-52 (June 12, 2015) (the "SSM SIP Call Rule").   Those SIP calls were based on EPA's conclusion that the reasoning of *NRDC* applied equally well to SIPs as to EPA-promulgated national hazardous air pollutant emission standards for categories of sources, and so any affirmative defense provision in a SIP is prohibited by the enforcement structure of the CAA.  *Id*.; 88 Fed. Reg. at 38,648-49.

EPA explained, in the Affirmative Defense Removal rulemaking, that the SSM SIP Call Rule addresses affirmative defense provisions, some of which "are analogous to the emergency affirmative defense" provisions in the Title V permitting rules, and so EPA's analysis in the SSM SIP Call Rule was "especially relevant" for the Affirmative Defense Removal.  81 Fed. Reg. at 38,648; *id*. at 38,650 ("just as EPA revisited affirmative defenses in SIP provisions in light of the *NRDC v. EPA* opinion," EPA is deciding to remove the Title V affirmative defense provisions "because they are not consistent with the CAA's enforcement structure."); *id*. at 38,650 n.27 ("The EPA's interpretation of the *NRDC v. EPA* case as it affects the affirmative defense provisions in parts

70 and 71 is similar to the interpretation of the case as articulated in the SSM SIP Call."); 88 Fed. Reg. at 47,031 and n.6.

EPA noted specifically that the SSM SIP Call Rule rejected SIP affirmative defense "provisions modeled after the §§ 70.6(g) and 71.6(g) emergency defense provisions" as "no longer consistent with the EPA's interpretation of the CAA…." *Id*. at 38,648. EPA even cited, as an example of how the rationale for the Affirmative Defense Removal followed the rationale for EPA's SIP calls for SSM affirmative defense provisions, its decision in the SSM SIP Call Rule that "an Arkansas SIP provision establishing an affirmative defense for emergencies, which may have been modeled after the EPA's title V regulations, was substantially inadequate to meet CAA requirements." *Id*. (That was something of an understatement; the affirmative defense provision in the Arkansas SIP was copied almost word-for-word from the Title V affirmative defense at 40 C.F.R. § 70.6(g).[12])

---

[12] *Compare* Arkansas Pollution Control & Ecology Reg. 19.602(A) *with* 40 C.F.R. § 70.6(g)(1)-(3). EPA called the affirmative defense for emergencies in the Arkansas SIP "an impermissible affirmative defense provision because it [*inter alia*] does not explicitly limit the defense to monetary penalties...." 79 Fed. Reg. 55,920, 55,942-43 (Sept. 17, 2014). EPA explained that Sierra Club objected to that Arkansas rule "because it provides a 'complete affirmative defense' for excess emissions that occur during emergency conditions," a contention that EPA accepted. *Id*. at 55,942. Like the Title V affirmative defense provisions, the affirmative defense provision in the Arkansas Title V permitting regulations provided that "An emergency constitutes an affirmative

This Court directly rejected EPA's interpretation of the enforcement authorities of the CAA, in consideration of *NRDC*, as prohibiting affirmative defense provisions, in the *SSM SIP Call Decision*. 94 F.4th at 98, 114-116. Except for provisions that just gave an affirmative defense to civil penalties[13], the Court concluded that affirmative defense provisions are permissible under the CAA, vacating the SIP calls that EPA had issued for SIP provisions that provided an affirmative defense to all liability. *Id*. In fact, the Court cited, as an example of the type of SIP affirmative defense provision that is not prohibited by the CAA, the Arkansas SIP provision that EPA identified in the Affirmative Defense Removal rulemaking as presenting a comparable supposed defect as the Title V affirmative defense provisions. *Id.* at 114.

## C.    The Court must vacate an action that EPA mistakenly thought was required by CAA §§ 113 and 304.

The Court must overturn an EPA action that is not the product of reasoned consideration, reasonably explained. In this case, the explanation EPA gave for reversing its decades-long conclusion that affirmative defense provisions, and in

---

defense to an action brought for non-compliance with such technology-based emission limitations...." Rule 19.602(A).

[13] The Title V affirmative defense provisions are not limited to relief from civil penalties; rather, they state that "[a]n emergency constitutes an affirmative defense to an action brought for noncompliance...." 40 C.F.R. § 70.6(g)(2).

particular the affirmative defense to liability for excess emissions arising out of emergencies contained in the Title V permitting regulations, are a permissible and appropriate way of accounting for the limitations of pollution control technology – that the statute precludes it –was simply wrong, as the *SSM SIP Call Decision* shows.[14]  When an agency misunderstands the statute as requiring the approach that the agency followed, the reviewing court must vacate and remand the agency action and may not consider arguments that might have justified the action as an exercise of agency discretion.  *See*, *e.g.*, *American Lung Ass'n v. EPA*, 985 F.3d 914, 944, 996 (D.C. Cir. 2021), *rev'd and remanded on other grounds*, *West Virginia v. EPA*, 597 U.S. 697 (2022) ("*American Lung Ass'n*")

Not only EPA's many statements during the subject rulemaking, but also the lengthy history of EPA's approach to affirmative defenses for emergencies and malfunctions, make clear that EPA issued the Affirmative Defense Removal because of its recently adopted, incorrect interpretation of the CAA as banning all types of affirmative defenses in CAA rules.  In the rulemaking, the Agency

---

[14] As explained in the preceding paragraphs, the Court upheld an affirmative defense provision in the Arkansas SIP worded almost identically to the Title V affirmative defense provisions, rejecting EPA's assertion that the Arkansas SIP's affirmative defense was contrary to the CAA's enforcement provisions, as interpreted by *NRDC*.  *SSM SIP Call Decision*, 94 F4th at 114-16; *compare* 79 Fed. Reg. at 55,942-43.

stated, over and over again, that it was removing the affirmative defense

provision in 40 C.F.R. §§ 70.6(g) and 71.6(g) because those provisions

conflicted with EPA's interpretation of the enforcement structure of the CAA, in

light of *NRDC. See*, pp. 10-13, 25-26, *supra*; 88 Fed. Reg. at 47,039

("provisions are, in and of themselves, inconsistent with the enforcement

structure of the CAA and thus legally impermissible").

Indeed, EPA cited to no change in the facts and policy/equity

considerations that led it to adopt the affirmative defense provisions and to

approve dozens of state permitting programs and thousands of permits

incorporating an affirmative defense for emergencies, over a period of more than

30 years. To the contrary, EPA reaffirmed many of them. *See*, *e.g.*, 88 Fed.

Reg. at 47,038. As explained at pp. 21-22, *supra*, EPA had favored the use of

affirmative defense provisions to address emissions arising out of malfunctions

and emergencies for decades, and it defended affirmative defense provisions in

rulemakings and in litigation as recently as 2013.[15] EPA first proposed to

require states to remove affirmative defense provisions in SIPs (in 2014), and

thereafter proposed to remove the affirmative defense provisions from its Title

---

[15] In fact, even after 2013 for a time EPA took the position again that affirmative
defense provisions are allowable under the CAA. See p. 12 n.4, *supra*.

V regulations (in 2016), only after *NRDC* was decided in 2014.[16] Clearly, this is a situation in which the Agency erroneously believed it was bound by the *NRDC* decision to change its mind and interpret the affirmative defense provisions of its Title V permitting regulations as contrary to the CAA. Accordingly, "the regulation must be declared invalid." *Texas v. EPA*, 91 F.4th 280, 300 (5th Cir. 2024), *quoting Am. Lung Ass'n*, 985 F.3d at 995.

## II. EPA's Reference to "Consistency" Does Not Justify the Affirmative Defense Removal.

EPA posed an additional, secondary consideration allegedly supporting the Affirmative Defense Removal: consistency with the approach to affirmative defenses that EPA had been taking in other contexts. 88 Fed. Reg. at 47,030. EPA referenced primarily consistency with its interpretations of the appropriateness of affirmative defense provisions in State Implementation Plans in policy statements and the 2015 SSM SIP Call Rule, and in the individual SIP calls it had issued for state affirmative defense provisions. *See*, *e.g.*, 88 Fed. Reg. at 47,030; *id*. at 47,031 n.6; *id*. at 47,038 n.37; 87 Fed. Reg. at 19,044; 81 Fed. Reg. at 38,650.

---

[16] *See* 79 Fed. Reg. 55,920 (Sept. 17, 2014); 81 Fed. Reg. 38,645 (June 14, 2016).

EPA did not suggest that this supposed benefit of consistency with other EPA actions was itself a sufficient reason for the Affirmative Defense Removal. *See* 88 Fed. Reg. at 47,038 ("The EPA is not removing the title V emergency affirmative defense provisions solely for the sake of consistency.")  In any case, consistency for consistency's sake is a dubious ground for rulemaking, much less for reversing longstanding EPA statutory interpretations and factual and policy conclusions.  The Affirmative Defense Removal must be judged on its own merits.  *See*, *e.g*., *Loper Bright*, 144 S. Ct. at 2267.  Because of EPA's "legally erroneous starting point" that the Title V affirmative defense provisions are impermissible under the CAA, the Affirmative Defense Removal Action must be vacated "[r]egardless of any policy-based reasons the EPA offers."  *See Am. Lung Ass'n*, 985 F.3d at 958.

But in any event, in this case the consistency that EPA primarily cited in support of the rule – consistency with EPA's policy on affirmative defense provisions in SIPs and EPA's issuance of SIP calls to numerous states that have affirmative defense provisions for SSM events in their SIPs – is no longer a valid claimed justification, because the Court rejected EPA's rationale related to affirmative defense provisions in SIPs and vacated most of the SIP calls EPA had issued for affirmative defense provisions, in its March 1, 2024, *SSM SIP Call Decision*.  *See* 94 F.4th at 98, 114-16.

Accordingly, to the extent that the Affirmative Defense Removal ever could have been justified on "consistency" with actions EPA has taken regarding affirmative defense provisions in SIPs, it now mus be reversed under CAA § 307(d)(9)(A). Obviously, consistency with now-vacated other EPA actions is an arbitrary and capricious grounds for the Affirmative Defense Removal.[17] *Cf. Solite Corp. v. EPA*, 952 F.2d 473, 493-94 (D.C. Cir. 1991) (Court's remand of a regulation that was based on an approach that EPA also relied on in extending that approach to a related subject in a new regulation required remand of the new regulation, as well).

## III.  The Affirmative Defense Removal Was Arbitrary and Capricious.

Clean Air Act § 307(d)(9)(A) requires this Court to reverse an EPA action that is arbitrary or capricious. An EPA action fits that description "if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 144 S. Ct. at 2053, *quoting FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Even

---

[17] EPA mentioned consistency with some other actions it has taken. But those other actions relate to particular types of emission standards for categories of sources, which would not be contradicted directly by the affirmative defense for emergencies in Title V permits (as opposed to broadly applicable rules that might be more analogous to Title V permitting rules). *See* 88 Fed. Reg. at 47,029. And the preamble to the Affirmative Defense Removal concentrates on alleged consistency with EPA's policy statements and actions related to affirmative defense provisions in SIPs and SIP calls issued by EPA. *See id.* at 47,031 n.6; *id.* at 47,038-39; 87 Fed. Reg. at 19,044; 81 Fed. Reg. at 38,650.

aside from EPA's incorrect conclusion that the affirmative defense provisions were impermissible under the CAA, the Affirmative Defense Removal was not reasonable or reasonably explained, because: EPA reversed longstanding policy decisions and understanding of Congressional intent with respect to technology-based emission limitations, without citing any changed facts; EPA failed to assess or identify benefit from imposing liability for emissions that by definition are unavoidable and so will occur anyway; and EPA failed to assess the costs of its action and weigh those costs in light of any regulatory benefits. As a result, petitioner SSM Litigation Group is entitled to reversal of the Affirmative Defense Removal. *See Ohio v. EPA*, 144 S. Ct. at 2054.

## A. The realities of industrial processes and the limitations of pollution control technology that warranted the affirmative defense have not changed.

Longstanding, more-contemporaneous agency interpretations are entitled to substantial weight. *See*, *e.g.*, *Loper Bright*, 144 S. Ct. at 2257-58, 2259, 2262; *id.* at 2283-84 (Gorsuch, J., concurring). When an agency reverses position, the bar on arbitrary and capricious rulemaking requires that the agency provide a clear justification for that reversal. *See, e.g., Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 106 (2015).

As explained at pp. 4-6, *supra*, EPA has a nearly 50-year history, supported by the courts, of concluding that emission limitations (or effluent

limitations) that are based on what sources can achieve with available technology should be accompanied by relief from liability, in one form or another, for exceedances associated with unavoidable limitations in the capability of that technology, during periods of malfunction. *See also*, *e.g*., 75 Fed. Reg. at 68,992 (explaining history of EPA approaches, including affirmative defense provisions, dealing with the fact that "despite good operating practices, sources may suffer a malfunction due to events beyond the control of the owner or operator"); 78 Fed. Reg. at 12,469-70 (affirmative defense addresses "limited circumstances in which excess emissions are entirely beyond the control of the owner or operator" and it is "EPA's view that a system that incorporates some level of flexibility is reasonable and consistent with the overall intent of the CAA.").

EPA followed this same approach when it included the affirmative defense provisions in the Title V permitting regulations. The Agency responded favorably to comments that the regulations should "make some provision for emergencies or 'upsets' caused by the failure of emission control equipment," finding that such a provision "is appropriate, consistent with the emphasis in the part 70 regulations on providing sources with adequate operational flexibility,…" 32,279 (July 21, 1992). In reaching its conclusion that "the emergency provision of § 70.6(g) is appropriate in order to provide permitted

sources with an affirmative defense where an enforcement action is brought for exceedances of technology-based standards due solely to the unforeseeable failure of technology," EPA cited caselaw addressing technology-based standards under both the CAA and the Clean Water Act supporting "[t]he idea that technology-based standards should account for the fallibility of technology." *Id*.

EPA acknowledges that the CAA does not contain any language preventing EPA from including an affirmative defense for emergencies in the Title V permitting regulations. 88 Fed. Reg. at 47,040. EPA does not assert that the facts supporting its conclusion that an affirmative defense for emergencies is consistent with the intent behind technology-based emission limitations in the CAA have changed. To the contrary, in the preamble to the Affirmative Defense Removal, EPA specifically recognized that those "underlying considerations supporting the EPA's past policies" related to "circumstances beyond the control of the source, (such as during emergencies)" have not changed. *See* 88 Fed. Reg. at 47,038. Even if this Court had not rejected EPA's interpretation of the CAA as preventing an affirmative defense for CAA liability associated with malfunctions/emergencies, in the *SSM SIP Call Decision*, it still would be arbitrary and capricious for EPA to abandon its long-standing interpretations of the CAA as permitting relief from liability during such

circumstances, when the facts and policy considerations supporting that EPA interpretation have not changed, and EPA has not provided any other explanation for favoring its new interpretation of "the structure of" the enforcement provisions of the Act over its long-standing interpretation of the intent behind the CAA's use of technology-based emission limitations. *See*, *e.g.*, *US Sugar*, 830 F.3d at 650. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 224 (2009) ("*Entergy*") ("it surely tends to show that the EPA's current practice is a reasonable and hence legitimate exercise of its discretion ... that the agency has been proceeding in essentially this fashion for over 30 years."); *id*. at 235 (Breyer, J., concurring in part and dissenting in part).

### B. The Affirmative Defense Removal will not prevent emergencies and their emissions.

In promulgating the Affirmative Defense Removal, EPA referred to comments on the proposed rule that asserted large amounts of pollutants could be emitted during an emergency. 88 Fed. Reg. at 47,046. But neither EPA's statements in the preamble to the proposed and final rules nor the public comments themselves provided evidence that those emissions would be prevented by removal of the affirmative defense for emergencies from Title V permits. By definition, the affirmative defense can only be successfully asserted for emissions arising from "sudden and reasonably unforeseeable events" that

are beyond the permittee's control and that are not "caused by improperly designed equipment, lack of preventive maintenance, careless or improper operation, or operator error." *See* 40 C.F.R. § 70.6 (g)(1). Additionally, the permittee must show that it "took all reasonable steps to minimize" the levels of emissions during the emergency. *Id*. at § 70.6 (g)(3). *See also* 85 Fed. Reg. 7232, 7236 (Feb. 7, 2020) ("Malfunctions, as defined in the Texas affirmative defense provision, cannot be deterred."); *id*. at 7242 ("Because the covered events, and resulting emissions that exceed applicable emission limitations, are unavoidable, by the very nature of source operations, they would occur regardless of whether the affirmative defense provisions were in the Texas SIP.").

There was thus no apparent reason for EPA to think that such events suddenly will cease to occur if the affirmative defense provisions are no longer available in facilities' Title V permits. EPA even offered its view that, in any event, permittees are unlikely to behave differently even if their permit contains an affirmative defense provision, due to uncertainties about whether the permittee ultimately could convince a court or EPA that it met all the requirements of the affirmative defense, concern about ability to "identify the cause(s) of the emergency" to qualify for the affirmative defense, etc. 88 Fed. Reg. at 47,044-45. *See also* 78 Fed. Reg. at 12,470 ("The EPA disagrees with

the suggestion that an affirmative defense [in a SIP] will encourage lax behavior by sources and, in fact, believes the opposite.").

In short, EPA had no reason to believe the Affirmative Defense Removal would result in significant emissions reductions; all it did was increase the potential liability of source operators for emissions they could not reasonably avoid despite using appropriate pollution control technology.[18]  Thus, EPA failed to provide a reasoned explanation for its action and to make the required connection between the facts and the action EPA took.  *See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983) ("*State Farm*").  It is, by definition, arbitrary and capricious rulemaking for EPA to impose burdens on state and EPA regional permitting authorities and on permittees for no, or at most a *de minimis*, regulatory benefit. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 332 (2014) ("However, EPA may require an 'anyway' source to comply with greenhouse-gas BACT

_____

[18] EPA also never even mentioned that, if excess emissions covered by the affirmative defense provision were causing or contributing to an imminent and substantial endangerment to public health or welfare, or to the environment, CAA § 303 authorizes the EPA Administrator to bring suit or issue an order to stop the emissions.  The Title V permitting regulations explicitly reserve EPA's authority to act under section 303 despite the general "permit shield" accorded to permittees in compliance with their permits' terms [which would include an affirmative defense permit term].  40 C.F.R. § 70.6(f)(3)(i).

*only if* the source emits more than a *de minimis* amount of greenhouse gases." (emphasis added)).

### C. EPA failed adequately to consider the adverse impacts of its action.

The Affirmative Defense Removal ordered most of the states to revise their state program regulations and submit their revised permitting programs to EPA and required states and EPA regional offices to revise the terms of thousands of Title V permits, removing a shield against potential CAA liability that permittees have had for close to 30 years.  Commenters pointed out that the proposed rule would, among other things, impose a significant paperwork and rulemaking burden on states to enact revised state regulations and to modify existing Title V permits referencing an affirmative defense.  88 Fed. Reg. at 47,049.  See, e.g., Public Comments of: Southern Ute Indian Tribe (May 10, 2022) at 2 (JA___); SSM Coalition (Aug. 15, 2016) at 13-14 (JA___-___); American Foundry Society (May 16, 2022) at 6 (JA___).  EPA acknowledged that "a large number of existing title V permits across the nation will eventually need to be revised to remove title V affirmative defense provisions."  88 Fed. Reg. at 47,051.  And yet, EPA made no attempt to determine the economic impact of the Affirmative Defense Removal or to assess the benefits (if any) that

its rulemaking would provide.[19] To the contrary: "The EPA is not basing this current action on potential air quality benefits, or a weighing of costs and benefits, associated with the removal of these provisions." 88 Fed. Reg. at 47,046.

In order to avoid arbitrary and capricious rulemaking, an agency needs to assess the costs that its regulatory action would impose and determine whether the costs and other adverse impacts of the rule would actually be greater than the benefits it would provide (unless the statute authorizing the agency action clearly prohibits the agency from doing so). *Loper Bright*, 144 S. Ct. at 2263; *Michigan v. EPA*, 576 U.S. at 752-53 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* disadvantages of agency decisions." *Id*. at 753; *Entergy*, 556 U.S. at 225-26; *id*. at 232-35 (Breyer, J., concurring in part and dissenting in part); *Business Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011) (SEC's "failure to apprise itself – and hence the public and Congress – of the economic consequences of a proposed regulation makes promulgation of the

---

[19] As explained in the preceding subsection, EPA essentially disclaimed any benefits would arise from the Affirmative Defense Removal. *See also*, 88 Fed. Reg. at 47,044-46. As for comments it received from permitting authorities describing the significant burden the proposed rule would impose, EPA essentially just said: There are mechanisms in place to make all those changes. *Id*. at 47,051-52.

rule arbitrary and capricious…" (internal quotes and citation omitted). EPA's refusal to do so renders the Affirmative Defense Removal arbitrary and capricious.

## IV. Reference to the Definition of "Emission Limitation" Does Not Justify the Affirmative Defense Removal.

Faced with the fact that this Court just rejected the interpretation of the CAA that caused EPA to change course after 30+ years and remove the affirmative defense for emergencies from EPA and state permitting regulations and from all Title V permits, EPA may try to salvage the Affirmative Defense Removal by claiming that an affirmative defense provision for emergencies is contrary to the CAA's definition of "emission limitation." That attempt should fail, on at least three grounds.

### A. The Court cannot uphold an EPA action on a rationale that EPA said at the time of promulgation did not apply.

In the Affirmative Defense Removal, EPA discussed "issues related to exemptions from emission limitations and the D.C. Circuit's 2008 decision in *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008) ["*Sierra Club*"]." 88 Fed. Reg. at 47,031. EPA asserted that the *Sierra Club* decision interpreted the CAA as requiring that "emission limitations must apply continuously and cannot contain exemptions, conditional or otherwise." 88 Fed. Reg. at 47,035. The Agency asserted that, if the affirmative defense for emergencies in the Title V

permitting regulations *were* an exemption, it would be contrary to this purported requirement of the CAA. 88 Fed. Reg. at 47,036.

But EPA emphatically and repeatedly said that the affirmative defense for emergencies was not an exemption; rather, the applicable technology-based emission limitations referenced in the Title V permit remained in effect, and the affirmative defense provisions only provided a means by which the permittee could try to prove that it should not be subject to liability for exceeding the emission limitation. *See*, *e.g*., 88 Fed. Reg. at 47,035 ("the EPA agrees…that the title V emergency affirmative defense provisions did not create exemptions or otherwise define whether a violation has occurred, as stated in the proposal."); *id*. at 47,036 ("the title V emergency affirmative defense provisions should not be interpreted to provide an exemption to emission limits"). EPA cannot now ask the Court to uphold the Affirmative Defense Removal based on a legal argument that EPA said at the time did not apply.

**B.      Inconsistency with *Sierra Club* was not the basis for the Affirmative Defense Removal.**

Even if EPA had not stated clearly its view that the Title V affirmative defense provisions did not constitute exemptions that would conflict with EPA's interpretation of the requirements of the CAA in light of *Sierra Club*, the Court still could not uphold the Affirmative Defense Removal on the grounds that it

was supported by *Sierra Club*. As recounted at pp. 22-26, *supra*, EPA stated clearly and repeatedly that it was acting because of its interpretation of the enforcement authorities of the CAA, in light of the *NRDC* decision. See, e.g., 88 Fed. Reg at 47,029 (the "emergency" affirmative defense provisions "are being removed because they are inconsistent with the EPA's interpretation of the enforcement structure of the" CAA); *id.* at 47,037 ("based on this reevaluation and the reasoning of the *NRDC* decision, the EPA has determined that it is appropriate to remove the emergency affirmative defense provisions").

The regulatory history also undercuts any claim that the Affirmative Defense Removal should be upheld even though this Court has rejected EPA's interpretation of the enforcement authorities of the CAA in light of *NRDC*. The definition of "emission limitation" in CAA § 302(k) has contained the "on a continuous basis" language since 1977, yet for decades thereafter EPA advocated affirmative defense provisions in SIPs as a way of addressing malfunctions and determined, in 1992, that it would be appropriate to include an affirmative defense for emergencies in Title V permitting regulations. *Sierra Club* was decided in 2008, long before EPA stopped encouraging and defending inclusion of an affirmative defense for malfunctions in SIPs. *See*, *e.g*., 75 Fed. Reg. at 68,991 n.5, 68,992; 78 Fed. Reg. at 12,470 ("While 'continuous' standards are required," citing CAA § 302(k) and *Sierra Club*, "EPA has

interpreted the CAA to allow affirmative defense provisions in certain narrowly prescribed circumstances.").  As explained at p. 28, *supra*, it was only after *NRDC* was decided, six years later, that EPA first proposed to object to affirmative defense provisions in SIPs and to remove the affirmative defense for emergencies from the Title V regulations.[20]

The Court can only uphold an agency action on the grounds that the agency gave for that action.  *See*, *e.g.*, *Ohio v. EPA*, 144 S. Ct. at 2055 n.11. There is no doubt that "the determinative reason" for the Affirmative Defense Removal was EPA's view that an affirmative defense was not permissible under the enforcement structures of the CAA.  *See Dept. of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. ___, 140 S. Ct. 1891, 1912-15 (2020), quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973).  Because EPA acted based on its incorrect interpretation that an affirmative defense to all liability was not allowed under the CAA in light of the *NRDC* decision, the Affirmative Defense Removal "must be vacated and the matter remanded to … [EPA] for further consideration."  *Camp v. Pitts*, 411 U.S. at 143.

---

[20] In contrast, EPA proposed to reverse its position that affirmative defense provisions were an appropriate means for SIPs to address unavoidable increases in emissions during malfunctions just six *months* after the *NRDC* opinion was issued.  *Compare* 749 F.3d 1055 *with* 79 Fed. Reg. 55,920.

### C. EPA has not demonstrated that *Sierra Club* requires EPA to delete the Title V affirmative defense provisions.

Even if EPA had based the Affirmative Defense Removal on the *Sierra Club* decision, EPA has not provided a sufficient justification for the Agency's new determination that the "emergency" affirmative defense provisions are contrary to the CAA. EPA devotes less than two pages of the Federal Register notice for the Affirmative Defense Removal to its discussion of (a) why the Court's interpretation of "emission limitation" in *Sierra Club* is not relevant to the affirmative defense provisions, followed by (b) mostly conclusory statements that, if it were relevant, the "logic" of *Sierra Club* would preclude the affirmative defense provisions. 88 Fed. Reg. at 47,035-36. There are several reasons why reference to *Sierra Club* does not suffice as a justification for reversing EPA's long-standing interpretation that the Title V affirmative defense provisions are consistent with the CAA's language and intent.

First, obviously, *Sierra Club* addressed whether EPA could outright exempt facilities from emission standards for hazardous air pollutants during SSM events. 551 F.3d at 1022. The Title V affirmative defense provisions did not legally exempt facilities from compliance with technology-based emission limitations, as EPA has noted. 88 Fed. Reg. at 47,034-35.

Secondly, the specific problem that the Court considered in *Sierra Club* was that CAA § 112 sets forth very detailed requirements EPA must meet when

promulgating emission standards for hazardous air pollutants, and yet EPA

specifically disclaimed that the exemption for SSM events addressed in *Sierra*

*Club* was issued pursuant to section 112. 551 F.3d at 1028. Because an

emission limitation or emission standard is defined in CAA § 302(k) as a

requirement that limits emissions "on a continuous basis," the Court determined

that "when sections 112 and 302(k) are read together," Congress required that

there be "continuous section 112-compliant standards" for hazardous air

pollutants (i.e., that there be some § 112-compliant standard applicable to a

§ 112-affected sources at all times). 551 F.3d at 1027. The Title V affirmative

defense provisions did not pertain specifically to any category of emission

standards for which Congress has dictated a particular level of stringency, and

EPA did not base the Title V Removal on reading CAA § 112 together with

§ 302(k).

Thirdly, the *Sierra Club* court specifically stated that the "continuous"

language in the section 302(k) definition of "emission limitation" does not mean

that the same emission limitation must apply at all times, 551 F.3d at 1027, or

must be "unchanging," *id*. at 1021. The opinion also recognized that, when it is

not "feasible" to "prescribe or enforce" a numerical emission limitation for

hazardous air pollutants, Congress allowed EPA to prescribe a design,

equipment, work practice, or operational standard under CAA § 112(h) in its

place.[21]  That flexibility is also present in the definition of "emission limitation" and "emission standard" in CAA § 302(k) itself (those terms include "any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard").[22]

If the affirmative defense provisions *were* an exemption from otherwise-applicable emission limitations, then in the infrequent circumstances when a particular emission limitation did not apply because the requirements of the affirmative defense for emergencies were met, *Sierra Club* says nothing about whether that would violate the CAA (other than if, for a hazardous pollutant, there is no otherwise-applicable emission standard issued pursuant to CAA §§

_____

[21] 551 F.3d at 1028.  See also *Sierra Club v. EPA*, 884 F.3d 1185, 1190 (D.C. Cir. 2018) ("Ordinarily," the strict limits on hazardous air pollutant emissions under CAA § 112 "must apply 'continuously'," even when the source is malfunctioning (citing *Sierra Club*, 551 F.3d at 1027-28), but the CAA "gives EPA certain kinds of carefully circumscribed flexibility," including the ability to "set qualitative 'work practice' standards, requiring sources to use certain protocols designed to minimize emissions in lieu of numeric limits measuring pollutants actually emitted.").

[22] *See also* CAA § 111(h) (new source performance standard can be expressed as "a design, equipment, work practice, or operational standard, or combination thereof").  The *SSM SIP Call Decision* did not reach the question whether an exemption renders a provision incompatible with the statutory definition of "emission limitation."  94 F.4th at 99 ("Even if we assume the correctness of the last step of the analysis – i.e., that an automatic exemption renders a given measure incompatible with the statutory definition of 'emission limitation' – EPA's rationale breaks down…").

112(d) or 112(h)[23]).  EPA has not identified a general requirement that all emissions pursuant to a Title V permit be subject to an emission limitation at all times.  *Cf. SSM SIP Call Decision*, 94 F.4th at 102-103.  Additionally, EPA failed to provide a cogent explanation why the requirements of the affirmative defense for emergencies (identifying the source of the emergency, ensuring proper operation before and during the emergency, and taking "all reasonable steps to minimize levels of emissions that exceeded the emission standards," *see* 40 C.F.R. § 70.6(g)(3)), would not meet the definition of a "design, equipment, work practice, or operational standard," and therefore ensure that an alternative "emission limitation" under the terms of CAA § 302(k) (specifically allowable under the language of *Sierra Club*) would apply during the emergency.[24]

EPA has not justified a reversal of its long-standing, and more contemporaneous, position that affirmative defense provisions *are* allowable under the CAA, including CAA § 302(k).  75 Fed. Reg. at 68,992 (describing factors EPA would consider to ensure particular SIP affirmative defense

---

[23] *See Sierra Club*, 551 F.3d at 1027-28.  As explained at p. 54-5, *infra*, commenters suggested that, if EPA saw a problem specifically related to application of the affirmative defense provisions to standards for hazardous air pollutants incorporated into a Title V permit, EPA could simply provide more clearly that the affirmative defense provision would not override the hazardous air pollutant emission standard.

[24] *See* 88 Fed. Reg. at 47,036.

provision was "consistent with the Act" and would "meet the requirements of the Act as interpreted by EPA"); 78 Fed. Reg. at 12,487 (EPA "interprets the CAA to allow" certain affirmative defenses for events "entirely beyond the control of the owner or operator of the source and for which the source must have taken all practicable steps to prevent and to minimize the excess emissions that result from the event."); *see also* 75 Fed. Reg. at 68,991 n.5. EPA's prior interpretation of the statute specifically addressed circumstances where affirmative defense provisions can "meet the requirements of CAA sections 110(a) and 302(k)." 78 Fed. Reg. at 12,487.

EPA never explained why it was better to abandon its prior interpretation of the CAA and adopt a new view: that a single phrase in the definitions section of the Act should frustrate congressional intent that emission limitations reflect the capabilities of available technology, especially considering that, when the "on a continuous basis" language was enacted, Congress presumably was aware of EPA's long-standing practice of allowing exemptions or affirmative defenses for excess emission events that a source operator could not reasonably have avoided. EPA also never engaged with the legislative history of the definition, which indicates it was adopted to address concerns about controls intentionally being operated on an intermittent basis. *See*, *Sierra Club*, 551 F.3d at 1027; *Kamp v. Hernandez*, 752 F.2d 1444, 1452 (9th Cir.1985). *See also, e.g.,*

Conference Report on H.R. 6161 (the CAA Amendments of 1977), H. Rep. No. 95-564 (August 3, 1977) at 129 (requirement to use "continuous emission controls" "clarifies that intermittent or alternative control measures are not permissible means of compliance"), 172; S. Rep. No. 94-717 (March 29, 1976) at 78 (amended definition clarifies that "[i]ntermittent controls or dispersion techniques are unacceptable as a substitute for continuous control of pollutants"); *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 434 n.54 (D.C. Cir. 1980) ("The 'intermittent' controls that concerned Congress were any of those which entailed temporary reductions in emissions when weather conditions were poor.").

Thus, even if EPA had based the Affirmative Defense Removal on a new interpretation that the provisions are prohibited by CAA § 302(k), that new interpretation would not pass muster under the analysis required by *Loper Bright.*, 144 S. Ct. at 2266, 2273.

## V.     EPA Failed To Respond Adequately to Public Comments.

In addition to ensuring that EPA acted within its statutory authority and engaged in reasoned decisionmaking, considering all relevant factors and explaining a rational connection between the facts and the decision it reached, the Court must determine specifically whether EPA considered and responded to

major substantive comments on the proposed action. *See* CAA § 307(d)(6)(B); *Ohio v. EPA*, 144 S. Ct. at 2054.

In the preamble to the Affirmative Defense Removal, EPA dismissed many of the comments opposing removal of the affirmative defense for emergencies from EPA's Title V permitting regulations, state Title V permitting regulations, and individual permits simply by saying that the CAA (under EPA's new interpretation) does not allow affirmative defenses. *See*, *e.g.*, 88 Fed. Reg. at 47,044; 47,046; 47,055.

As explained in Section I. of this Argument, EPA's statements that affirmative defense provisions like the Title V permit affirmative defense for emergencies are prohibited by the CAA were wrong. For that reason, EPA failed to meet its statutory obligation to respond to significant public comments and criticisms. *See Sierra Club v. EPA*, 863 F.3d 834, 839 (D.C. Cir. 2017) (EPA failed to meet its obligation when "the agency's responses to the comments consisted principally of the same … argument we rejected above.").

In addition, EPA failed to engage with comments arguing that, if EPA interprets the Title V affirmative defense to conflict with certain kinds of emission limitations that EPA-promulgated emission standards or court interpretations specifically require to be met at all times, regardless of emergencies or other factors beyond the source operator's control, then the

solution to that perceived problem is to amend the Title V permitting regulations to restrict the application of the affirmative defense for emergencies to such emission limitations, rather than removing the affirmative defense altogether. *See*, *e.g.*, Public comments of: Ohio Chemistry Technology Council *et al*. (Aug. 15, 2016) at ___ (JA___); SSM Coalition (Aug. 15, 2016) at 3, 16 (JA___, JA___); 88 Fed. Reg. at 47,038. EPA's response was that suggested alternatives, regardless of their merit otherwise, fail because any sort of affirmative defense provision is "legally impermissible" under EPA's [incorrect] interpretation of *NRDC*. 88 Fed. Reg. at 47,039.

An agency's action is arbitrary and capricious if the agency failed to consider less-burdensome regulatory alternatives, or failed to explain why an available less-burdensome alternative was not adopted. *Dept. of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. at 1912-15; *State Farm,* 463 U.S. at 48. Dismissing less-burdensome alternatives with an inaccurate statement that any alternatives are banned by the language of the statute fails to satisfy EPA's obligations under CAA §§ 307(d)(6)(B) and (9)(A) to respond to each significant comment and to adopt rules that are not arbitrary and capricious.

## **CONCLUSION**

For the foregoing reasons, the Court should vacate and remand EPA's July 21, 2023 removal of the affirmative defense for emergencies in regulations

for CAA Title V permitting, the former 40 C.F.R. §§ 70.6(g) and 71.6(g), including its direction that states remove corresponding affirmative defense provisions from their state program regulations, and directing states and EPA to remove affirmative defense provisions from Title V permits they have issued.

Vacatur is appropriate and necessary here because the EPA action was based on an interpretation of the CAA that the Court has rejected, and EPA did not provide any other clear justification for reversing its prior determinations that an affirmative defense for emergencies is appropriate. And yet EPA nevertheless is continuing to implement the requirements of the Affirmative Defense Removal that states modify their operating permit regulations and remove affirmative defense provisions from individual permits. *See*, *e.g.*, *American Lung Ass'n*, 985 F.3d at 996; *Corner Post, Inc. v. Board of Governors of the Fed. Reserve Sys.*, 603 U.S. ___, 144 S. Ct. 2440, 2460-70 (2024) (Kavanaugh, J., concurring).

Dated: July 29, 2024   Respectfully submitted,

/s/ Russell S. Frye
Russell S. Frye
FryeLaw PLLC
1629 K Street, N.W., Suite 300
Washington, DC 20006-1631
(202) 572-8267
Fax: (866) 850-5198
E-mail: rfrye@fryelaw.com
*Counsel for SSM Litigation Group*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Cir. Rule 32(e)(2)(B) and the Court's July 8, 2024 order on briefing schedule and format, because this brief contains 12,936 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using MS Word with Times New Roman font and 14-point type.

<div align="right">

/s/ Russell S. Frye
Russell S. Frye
FryeLaw PLLC
1629 K Street, N.W.  Suite 300
Washington, DC  20006-1631
(202) 572-8267
Fax: (866) 850-5198
rfrye@fryelaw.com
*Counsel for SSM Litigation Group*

</div>

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that, on this 29th day of July 2024, I electronically filed the foregoing SSM Litigation Group's Proof Opening Brief with the Clerk of the Court using the Court's CM/ECF system.  Copies of the brief and addendum therefore were served electronically through the Court's CM/ECF system on all registered counsel.

<u>/s/ Russell S. Frye</u>
Russell S. Frye
FryeLaw PLLC
1629 K Street, N.W.  Suite 300
Washington, DC  20006-1631
(202) 572-8267
Fax: (866) 850-5198
rfrye@fryelaw.com
*Counsel for SSM Litigation Group*