# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 14, 2025         Decided September 5, 2025

No. 23-1267

SSM LITIGATION GROUP,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

CALIFORNIA COMMUNITIES AGAINST TOXICS, ET AL.,
INTERVENORS

On Petition for Review of a Final Action
of the Environmental Protection Agency

*Russell S. Frye* argued the cause and filed the briefs for petitioner.

*Daniel R. Dertke*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Todd Kim*, Assistant Attorney General.

*Joshua Smith*, *Andrea Issod*, *Deena Tumeh*, *Seth L. Johnson*, *Patton Dycus*, *John D. Walke*, and *Emily K. Davis*

were on the brief for environmental intervenors in support of respondent.

Before: RAO and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Pollution control technology sometimes fails due to an emergency or other unforeseen event. During such emergencies, a stationary source of air pollution may exceed its emission limitations. For decades, the Environmental Protection Agency recognized this reality by providing an affirmative defense to liability for excess emissions caused by emergency events. In 2023, the agency rescinded the defense, concluding it was unlawful because it encroached on the judiciary's authority under the Clean Air Act to impose "appropriate civil penalties." 42 U.S.C. § 7604(a). In addition, EPA maintained the defense was unlawful because it could be construed as an exemption that rendered emission standards non-continuous in violation of the Clean Air Act.

In its petition for review, SSM Litigation Group argues EPA's rescission of the Title V affirmative defense was arbitrary and capricious because it rests entirely on erroneous legal justifications. We agree and therefore grant the petition.

I.

The Clean Air Act authorizes EPA to impose emission standards and limitations for various sources of air pollution, including factories and power plants. The Act defines an emission limitation as "a requirement … which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. § 7602(k). As relevant here,

3

EPA sets emission limitations based on the capabilities of pollution control technology. *See, e.g.*, *id.* §§ 7411, 7412. Title V of the Clean Air Act, enacted in 1990, establishes a permitting regime for facilities that emit air pollution. *Id.* §§ 7661 *et seq.* This regime "consolidate[d] existing air pollution requirements into a single document, the Title V permit." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 597 (D.C. Cir. 2016) (cleaned up).

All operators of stationary sources of air pollution are required to apply for and hold a Title V permit, which must list the "enforceable emission limitations and standards" applicable to the source under the Clean Air Act. 42 U.S.C. § 7661c(a); *see id.* § 7661a(a). If an operator violates the emission limitations and standards incorporated in its permit, the operator can be sued for injunctive relief and "any appropriate civil penalties." *Id.* § 7604(a); *see id.* § 7413(b). But the permit also creates a "shield" from liability that treats compliance with the permit's terms as compliance with applicable Clean Air Act requirements. *Id.* § 7661c(f).

Shortly after Congress enacted Title V, EPA promulgated regulations that created a narrow defense for stationary sources that exceed their emission limitations due to an emergency event. *See* 57 Fed. Reg. 32250, 32306 (1992) (establishing affirmative defense for holders of state-issued Title V permits); 61 Fed. Reg. 34202, 34239 (1996) (extending affirmative defense to holders of federally issued permits). These regulations created "an affirmative defense to an action brought for noncompliance with … technology-based emission limitations" during an emergency. 40 C.F.R. § 70.6(g)(2) (2022). The regulations defined an emergency as "any situation arising from sudden and reasonably unforeseeable events beyond the control of the source, including acts of God," that "causes the source to exceed a technology-based emission

4

limitation under the permit, due to unavoidable increases in emissions attributable to the emergency." *Id.* § 70.6(g)(1) (2022). To qualify for the defense, the permittee was required to prove that "[a]n emergency occurred," that the facility was "being properly operated," and that the permittee had taken "all reasonable steps" to minimize excess emissions during the emergency. *Id.* § 70.6(g)(3) (2022). If the defense applied, a permittee would not be found in violation of the Clean Air Act for exceeding its emission limitations. *Id.* § 70.6(g)(2) (2022).

For decades, EPA retained the Title V affirmative defense for emergencies. In 2016, however, EPA proposed rescinding the defense on the ground that it unlawfully encroached on the judiciary's role to impose "any appropriate civil penalties" for Clean Air Act violations. 42 U.S.C. § 7604(a); *see* 81 Fed. Reg. 38645, 38648–49 (2016) (discussing *NRDC v. EPA*, 749 F.3d 1055 (D.C. Cir. 2014)). In the alternative, EPA concluded the defense was unlawful because it operated as an exemption from otherwise applicable emission limitations, rendering those limitations non-continuous in violation of 42 U.S.C. § 7602(k). 81 Fed. Reg. at 38648 n.12 (discussing *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008)). EPA rescinded the defense in a final rule issued in 2023. 88 Fed. Reg. 47029, 47030–31 (2023).

SSM Litigation Group ("SSM"), a coalition of trade associations some of whose members operate stationary sources of air pollution and hold Title V permits, petitioned for review.

II.

We begin, as we must, with our jurisdiction. We have exclusive jurisdiction over petitions challenging "any … nationally applicable regulations promulgated, or final action taken, by the [EPA] Administrator." 42 U.S.C. § 7607(b). The

5

government and environmental intervenors maintain that SSM has failed to demonstrate standing. Because SSM is an association ultimately representing entities directly regulated under Title V, we conclude it has standing to challenge the rescission of the Title V affirmative defense.

A.

To demonstrate associational standing, "an organization must show that (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (cleaned up). At the time SSM submitted its petition, the D.C. Circuit Rules required a direct review petitioner to "set forth the basis for the claim of standing" in its opening brief and, if standing is not apparent from the administrative record, to establish standing through "arguments and evidence."[1] D.C. Cir. R. 28(a)(7) (2024). In applying this rule, we have "allowed petitioners to proceed if a reply brief fleshes out a timely raised theory of standing and also makes standing patently obvious and irrefutable." *Sierra Club v. U.S. Dep't of Energy*, 107 F.4th 1012, 1015 (D.C. Cir. 2024) (cleaned up).

B.

The parties do not dispute that the interests SSM seeks to protect are germane to its purpose or that the claim asserted and relief sought—reversal of a rule—do not require the

---

[1] D.C. Circuit Rule 28(a)(7) has since been amended, effective August 11, 2025, to require all petitioners to include, in their opening briefs, arguments and evidence establishing standing, regardless of whether standing is apparent from the administrative record.

6

participation of individual members. *Int'l Dark-Sky Ass'n*, 106 F.4th at 1217. They disagree only over whether SSM has demonstrated, in accordance with our local rules, that it has members that would have standing to sue in their own right. We conclude SSM has made this showing.

SSM raised a straightforward theory of standing in its opening brief. It explained that it is a coalition of trade associations "whose members operate stationary sources of air pollution subject to operating permits issued under [Clean Air Act] Title V" and who were protected "under an affirmative defense provision" for emergencies. SSM Br. at 18. In other words, SSM's member associations have members that are directly regulated under Title V and that have been exposed to liability by EPA's rescission of the affirmative defense included in their permits. That injury is redressable by an order of this court setting aside the rescission regulation.

Neither EPA nor intervenors question that a holder of a Title V permit would have standing to sue if its permit included the affirmative defense. EPA argues only that SSM failed to provide evidence that it represents such permit holders. To be sure, SSM neglected in its opening brief to attach declarations from any member association, instead providing those declarations only in its reply brief. But that delay in providing evidence of standing is excusable because (1) the administrative record "went a long way toward showing standing"; (2) the reply brief declarations did not raise a new theory of standing and made standing "patently obvious"; and (3) EPA "suffered no prejudice" from the delay. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 112 (D.C. Cir. 2021).

First, when filing its petition, SSM reasonably concluded the administrative record was sufficient to establish its standing. As SSM pointed out in its opening brief, numerous

7

commenters in the rulemaking process raised a similar theory of injury caused by the rescission of the affirmative defense. *See, e.g.*, J.A. 55 (comment by Ohio Chemistry Technology Council, et al., explaining its "members are subject to regulation by Ohio's … fully-approved Title V operating permit program, and have a direct and substantial interest in the action proposed by EPA"); J.A. 59 (comment by a trade association explaining its "members own and operate manufacturing facilities … affected by the proposed change in the operating permit program regulations because they are required to have [Clean Air Act] operating permits"). At the time SSM filed its petition, Circuit Rule 28(a)(7) required evidence of standing only when standing was "not apparent from the administrative record." D.C. Cir. R. 28(a)(7) (2024). But the record here demonstrates that directly regulated Title V permit holders are injured by the rescission—an entirely obvious and straightforward theory of standing.

SSM's reliance on the administrative record in its opening brief was reasonable, particularly because the requirement that an association identify specific members is most salient when an association represents third parties who are not directly regulated. *See, e.g.*, *Sierra Club v. EPA*, 292 F.3d 895, 901–02 (D.C. Cir. 2002) (evaluating whether individuals had standing to challenge rule regulating facilities generating or treating toxic wastewater); *Chamber of Commerce v. EPA*, 642 F.3d 192, 200–10 (D.C. Cir. 2011) (evaluating whether automobile dealers had standing to challenge rule regulating automobile manufacturers); *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 613–14 (D.C. Cir. 2019) (evaluating whether retirees had standing to challenge rule regulating investment funds). SSM asserted its members represent directly regulated Title V permit holders, and the explanation of why such directly regulated entities have standing is clearly established by the administrative record.

8

Second, although SSM did not identify specific regulated entities in its opening brief, it provided the necessary declarations in its reply brief, which "ma[de] standing patently obvious and irrefutable." *Dep't of Energy*, 107 F.4th at 1015 (cleaned up). In its reply brief, SSM attached declarations from member associations that corroborated its original theory of standing. For example, the American Chemistry Council attested that it is part of SSM and that its members "have facilities required to have an operating permit under Title V of the Clean Air Act," some of which "are located in states that had approved state Title V permitting programs that contained Title V affirmative defense provisions." Reply Br., Ex. B., Decl. of Dr. Kimberly White. The American Forest and Paper Association attested to similar facts. *See* Reply Br., Ex. A, Decl. of Timothy Hunt (attesting the Title V affirmative defense "had been either stated in or incorporated by reference in" the Title V permits "that some or all" of the associations' members' are required to have). These declarations make standing patently obvious and irrefutable because they confirm that the facilities SSM ultimately represents are "object[s] of the action (or forgone action) at issue." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

At oral argument, EPA suggested the reply brief declarations were deficient because they failed to name individual facilities. Our precedents are clear, however, that "anonymity is no barrier to standing on this record" because SSM's members are "directly regulated by the … [r]ule" and naming them would "add[] no essential information bearing on the injury component of standing." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (cleaned up). EPA does not, and cannot, maintain that a directly regulated facility protected by the affirmative defense lacks standing to challenge its rescission. And there is no serious dispute that SSM's reply brief

9

declarations—made under penalty of perjury—establish that SSM represents such facilities.

Finally, because SSM's standing is irrefutable and the reply brief declarations merely bolster its original theory of standing, EPA "was not prejudiced by its inability to respond to the supplemental declarations." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004); *see also Dep't of Energy*, 107 F.4th at 1015 (same). We may consider these reply brief declarations, which conclusively establish that SSM has associational standing.

III.

On the merits, we conclude EPA's rescission of the affirmative defense was not reasonably explained and not in accordance with law. *See* 42 U.S.C. § 7607(d)(9)(A) (authorizing reviewing court to "reverse any … action found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1064 (D.C. Cir. 1995) (explaining the Clean Air Act's standard of review "is essentially the same" as that of the Administrative Procedure Act). The agency justified its rescission exclusively on legal grounds, asserting the Title V affirmative defense was unlawful for two alternative reasons. First, EPA primarily maintained the affirmative defense encroached on the judiciary's statutory authority to assess civil penalties. In the alternative, EPA stated the defense functioned as an exemption that rendered emission limitations non-continuous in violation of the Clean Air Act. Because the

10

agency's rescission regulation was premised entirely on erroneous legal justifications, it must be reversed.

A.

EPA justified its rescission of the Title V affirmative defense primarily on the ground that the defense unlawfully encroached on the judiciary's role under the Clean Air Act to assess penalties for violations of emission limitations. *See* 88 Fed. Reg. at 47030–34. EPA based this conclusion on *NRDC v. EPA*, which held that a partial affirmative defense to monetary penalties unlawfully restricted the judiciary's statutory authority to impose "appropriate civil penalties." 749 F.3d at 1063 (quoting 42 U.S.C. § 7604(a)). EPA now concedes—and the environmental intervenors largely do not dispute—that the primary rationale for the rescission has been foreclosed by our intervening decision in *Environmental Committee of Florida Electric Power Coordinating Group, Inc. v. EPA*, 94 F.4th 77 (D.C. Cir. 2024) ("*Florida Electric*").

In *Florida Electric*, we clarified the critical distinction between a true affirmative defense that operates as a complete defense to Clean Air Act liability—as does the Title V defense for emergencies—and an affirmative defense that merely "precludes certain remedies after a source has violated an emission rule." *Id.* at 114. The latter is better understood as a limitation on remedies. *Id.* at 86 (discussing different types of affirmative defenses). Under the Clean Air Act, the EPA has no authority to create a regulatory "defense" that limits the remedial authority granted by Congress to the federal courts. *Id.* at 114–15. But a complete affirmative defense, like the one at issue here, is permissible because it relates to the antecedent question of liability and therefore does not impinge on the judiciary's authority to award "appropriate civil penalties." 42 U.S.C. § 7604(a).

11

Because the Title V affirmative defense is a complete defense to liability, not a limitation on judicial remedies, EPA's primary rationale for its rescission was erroneous.

B.

EPA and the environmental intervenors also defend the rescission regulation on the ground that the Title V affirmative defense is effectively an exemption from applicable emission limitations and therefore renders those limitations not "continuous" in violation of the Clean Air Act, as interpreted by this court in *Sierra Club v. EPA*, 551 F.3d at 1027–28. This rationale finds no support in the Clean Air Act or *Sierra Club*.

The Clean Air Act requires EPA to establish emission standards. *See, e.g.*, 42 U.S.C. § 7412(d). And the Act defines an emission standard or limitation as a requirement that "limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis*." *Id.* § 7602(k) (emphasis added). Reading these provisions together in a case involving section 112 standards, we interpreted the Clean Air Act to require "that some section 112 standard apply continuously." *Sierra Club*, 551 F.3d at 1028. We held that a regulation that expressly lifted section 112 standards during periods of startup, shutdown, and malfunction was contrary to the Act. *Id.*

The reasoning of *Sierra Club*, however, does not support EPA's contention that the Title V affirmative defense is unlawful. The agency's argument conflates two distinct legal concepts: an affirmative defense to liability and an *ex ante* exemption from an emission standard. An affirmative defense allows a defendant to avoid liability, but it does not alter the underlying legal requirements.[2] *See* Wright & Miller, 5 Fed.

---

[2] The concept of an affirmative defense derives from the common law pleading device known as confession and avoidance. *See*

12

Prac. & Proc. Civ. § 1270 (4th ed. updated May 2025). The very concept of an affirmative defense assumes that a legal standard remains in force, because otherwise there would be no claim—and no need for an affirmative defense. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1303 (11th Cir. 1999) ("An affirmative defense is generally a defense that, if established, requires judgment for the defendant even if the plaintiff can prove his case."). Unlike the regulatory exemption in *Sierra Club*, which suspended emission standards during certain times, the Title V affirmative defense for emergencies does not lift applicable standards. Because the emission standards are never lifted, they apply "on a continuous basis" as required by the Clean Air Act. 42 U.S.C. § 7602(k).

EPA leans on the fact that in *Florida Electric* we described complete affirmative defenses as "creat[ing] an exemption from the normal emission rule" and as "functionally exemptions." 94 F.4th at 114, 116. Those descriptions, however, were necessary only to distinguish complete affirmatives defenses from partial affirmative defenses—and to explain why the complete affirmative defenses did not encroach on the judiciary's power to choose appropriate remedies for a Clean Air Act violation. *Id.* at 114. We did not otherwise collapse the legal distinction between an affirmative defense and an *ex ante* exemption from a legal standard. And, as EPA acknowledges in its brief, *Florida Electric* did not reach the question of whether a complete affirmative defense

---

Shipman, Common-Law Pleading § 166, p. 299–301 (3d ed. 1923). Confession and avoidance contrasts with demurrer, which is an assertion that a claim is legally insufficient on its own terms. *See id.* §§ 146–47, p. 277–79. Today, litigants make such insufficiency assertions through a motion to dismiss, Fed R. Civ. P. 12(b)(6), whereas affirmative defenses must typically be raised in a responsive pleading, Fed R. Civ. P. 8(c)(1).

13

would render an emission limitation non-continuous in violation of the Clean Air Act. *See id.*; EPA Br. at 40.

Squarely presented with that question, we now hold that a complete affirmative defense to liability does not render an emission limitation non-continuous under 42 U.S.C. § 7602(k). EPA therefore cannot justify its rescission of the Title V affirmative defense on the ground that it renders emission limitations non-continuous.

\* \* \*

EPA rescinded a thirty-year-old affirmative defense on the ground that it was unlawful under the Clean Air Act. EPA's reasoning, however, cannot be squared with the text of the Clean Air Act or our precedents. Because EPA offered no independent policy rationale, its rescission regulation was unreasonable and not in accordance with law. We therefore grant the petition and reverse the rescission.

*So ordered*.