No. 23-1267

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SSM LITIGATION GROUP,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

## ENVIRONMENTAL RESPONDENT-INTERVENORS'
## PETITION FOR REHEARING *EN BANC*

Seth L. Johnson
Deena Tumeh
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 793-6482
(202) 745-5214
sjohnson@earthjustice.org
dtumeh@earthjustice.org
jpew@earthjustice.org

*Counsel for Sierra Club, Ironbound
Community Corporation, and California
Communities Against Toxics*

Dated: October 20, 2025

Joshua Smith
Andrea Issod
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
joshua.smith@sierraclub.org
andrea.issod@sierraclub.org

*Counsel for Sierra Club*

*Additional counsel on following page*

Sanghyun Lee
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, DC 20006
(202) 263-4441
slee@environmentalintegrity.org

*Counsel for Environmental Integrity
Project*

John D. Walke
Emily K. Davis
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense
Council*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY................................................................................v

INTRODUCTION AND RULE 40(B) STATEMENT ............................................1

BACKGROUND ........................................................................4

ARGUMENT ..........................................................................8

I.   The panel decision conflicts with Circuit precedent..........................................8

   A.   The panel decision conflicts with *Sierra Club*, *U.S. Sugar*, and *Florida Electric*, as well as with precedent barring end runs around core statutory requirements...................................................................8

   B.   The panel decision's distinctions without differences lack merit. ...............12

II.  The panel decision raises a question of exceptional importance. ....................16

CONCLUSION ........................................................................18

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..................20

ADDENDUM

   Opinion from Which Rehearing Is Being Sought

   Certificate as to Parties, Rulings, and Related Cases

   Environmental Respondent-Intervenors' Rule 26.1 Disclosure Statement

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019)........................................................4, 11, 12

*Cnty. of Maui v. Haw. Wildlife Fund*,
  590 U.S. 165 (2020)........................................................4, 10, 11

*Cunningham v. Cornell Univ.*,
  604 U.S. 693 (2025)...............................................................12, 13

*Env't Comm. of Fla. Elec. Power Coordinating Grp. v. EPA*,
  94 F.4th 77 (D.C. Cir. 2024)........................................2, 4, 8, 10, 12, 15

*Env't Integrity Project v. EPA*,
  425 F.3d 992 (D.C. Cir. 2005).........................................................5

*FTC v. Morton Salt Co.*,
  334 U.S. 47 (1948)....................................................................13

*In re Grand Jury Investigation*,
  916 F.3d 1047 (D.C. Cir. 2019).......................................................16

*Leopold v. Manger*,
  102 F.4th 491 (D.C. Cir. 2024).......................................................16

*Miss. Comm'n on Env't Quality v. EPA*,
  790 F.3d 138 (D.C. Cir. 2015)........................................................16

*NRDC v. EPA*,
  777 F.3d 456 (D.C. Cir. 2014)...................................................4, 11, 12

*Palmer v. FAA*,
  103 F.4th 798 (D.C. Cir. 2024).......................................................13

*SBC Commc'ns v. FCC*,
  373 F.3d 140 (D.C. Cir. 2004).........................................................9

*Seminole Tribe of Fla. v. Fla.*,
  517 U.S. 44 (1996)...................................................................15

*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008) .................................. 1, 2, 4, 8, 9, 10, 12, 14, 17

*U.S. Sugar v. EPA*,
    830 F.3d 579, *amended in unrelated part on reh'g*, 844 F.3d 268
    (D.C. Cir. 2016) ........................................................2, 4, 8, 10, 12

*United States v. Ohio Edison Co.*,
    276 F. Supp. 2d 829 (S.D. Ohio 2003) ....................................14

*Utah Physicians for a Healthy Env't v. Harley-Davidson of Salt Lake
    City*,
    2:22-CV-00473-DBB-DAO, 2024 WL 3276844
    (D. Utah July 1, 2024) ...................................................14

*Wright v. Southland Corp.*,
    187 F.3d 1287 (11th Cir. 1999) .........................................13

**Statutes**

42 U.S.C. § 7401(b)(1) ......................................................16

42 U.S.C. § 7411(b)(1)(B) ...................................................17

42 U.S.C. § 7412 ..........................................................1, 14

42 U.S.C. § 7412(d) ..........................................................3

42 U.S.C. § 7412(d)(1) .......................................................17

42 U.S.C. § 7412(f)(2) .......................................................17

42 U.S.C. § 7429(a)(1)(A) ....................................................17

42 U.S.C. § 7429(b)(1) .......................................................17

42 U.S.C. § 7602(k) ........................................................2, 17

42 U.S.C. § 7602(*l*) ........................................................17

**Code of Federal Regulations**

40 C.F.R. § 70.6(g)(5) (2022) ...............................................13

**Federal Register Notices**

57 FR 32,250 (July 21, 1992) ........................................................5

61 FR 34,202 (July 1, 1996) ..........................................................5

80 FR 33,840 (June 12, 2015) ........................................................7

88 FR 47,029 (July 21, 2023) ......................................................5, 8

**Legislative History**

H.R. Rep. No. 95-294 (1977) ..............................................3, 17, 18

S. Rep. No. 94-717 (1976) ...........................................................17

# GLOSSARY

EPA         U.S. Environmental Protection Agency

SSM        Startup, shutdown, and malfunction

# INTRODUCTION AND RULE 40(b) STATEMENT

The panel here ruled that, though the Clean Air Act unambiguously prohibits the Environmental Protection Agency ("EPA") from exempting sources from complying with emission limitations, that prohibition does not itself preclude EPA-created complete affirmative defenses that excuse sources from liability for violating emission limitations during claimed emergencies. Because the panel decision conflicts with binding precedent of this Court and the Supreme Court, this Circuit should rehear this case *en banc*.

This Circuit's precedent establishes that air pollution emission limitations must be continuous, that exemptions from them are unlawful, and that complete affirmative defenses to liability for violating emission limitations are at the very least functional equivalents to exemptions.

In 2008, this Court vacated an EPA-created regulatory exemption from emission limitations under Clean Air Act § 112 during startup, shutdown, and malfunction ("SSM") periods because the Act requires EPA to establish emission limitations under § 112 that meet certain stringencies, and § 302(k) requires "emission limitations" to limit pollution emissions "on a continuous basis." *Sierra Club v. EPA*, 551 F.3d 1019, 1027-28 (D.C. Cir. 2008) ("When sections 112 and 302(k) are read together…, Congress has required that there must be continuous

section 112-compliant standards."); 42 U.S.C. § 7602(k) (defining "emission limitation" and "emission standard" identically). This Court explained EPA's exemption violated the Act because it meant that, "during SSM events," "no section 112 standard governs these events." *Sierra Club*, 551 F.3d at 1028. Thus, *Sierra Club* holds that EPA cannot create an exemption from the statutorily required level of control.

Eight years later, this Circuit affirmed *Sierra Club*'s key holding. *U.S. Sugar v. EPA*, 830 F.3d 579, 606-10, *amended in unrelated part on reh'g*, 844 F.3d 268 (D.C. Cir. 2016). *U.S. Sugar* holds that regardless of whether exempting sources from compliance with emission limitations when they malfunction may appear to be a "reasonable" approach, *Sierra Club* bars it. *Id.* 607, 609. *U.S. Sugar* also makes clear that the definition of "malfunction" covers "a wide array of circumstances," including incidents like "an explosion." *Id.* 608.

Following its *Sierra Club* and *U.S. Sugar* decisions, this Court unanimously confirmed in reviewing challenges to EPA's call for revisions to state pollution-control plans that complete affirmative defenses to liability "create an exemption from the normal emission rule" that governs a source's emissions and are the functional equivalent of exemptions. *Env't Comm. of Fla. Elec. Power Coordinating Grp. v. EPA*, 94 F.4th 77, 114, 116 (D.C. Cir. 2024) ("*Florida Electric*"); *see id.* 124

(Pillard, J., dissenting) ("As the majority recognizes, some affirmative defenses functionally 'create an exemption from the normal emission rule.'").

The continuity requirement is fundamental to the statutory scheme. The Act requires numerous emission limitations. *E.g.*, 42 U.S.C. § 7412(d). When Congress amended the Act in 1977 to require emission limitations to govern continuously, it made clear that its new requirement was needed to achieve the Act's goal of clean, healthy air for all Americans. H.R. Rep. No. 95-294, at 92 (1977) ("House Report") ("Without an enforceable emission limitation which will be complied with at all times, there can be no assurance that ambient standards will be attained and maintained.").

Here, the panel invalidated EPA's decision to eliminate from its Title V regulations a complete affirmative defense to liability for violations of technology-based emission standards during periods of operation claimed as emergencies. Although the panel didn't disagree with EPA that such affirmative defenses function exactly the same as exemptions from compliance, it held they are "legally distinct" and therefore "that a complete affirmative defense to liability does not render an emission limitation non-continuous under [§ 302(k)]." Panel Decision ("Op.") 11-13. The panel dismissed as *dictum Florida Electric*'s holding that complete affirmative defenses are at least functionally identical to exemptions. *Id.* 12-13. The panel properly didn't consider whether the Act granted EPA authority to create such an

affirmative defense in the first place, and didn't suggest the Act somehow requires such an affirmative defense.

The panel decision conflicts with this Circuit's decisions in *Sierra Club*, 551 F.3d 1019; *U.S. Sugar*, 830 F.3d 579; and *Florida Electric*, 94 F.4th 77. Further, because the panel decision holds the Act's core prohibition on exemptions from emission standards formalistically permits functionally identical affirmative defenses, the decision also conflicts with D.C. Circuit and Supreme Court precedent that prohibit end runs around fundamental statutory commands. *See, e.g.*, *County of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 178-79 (2020); *Apple Inc. v. Pepper*, 587 U.S. 273, 283-85 (2019); *NRDC v. EPA*, 777 F.3d 456, 466-67 (D.C. Cir. 2014). The panel decision also raises the exceptionally important question of whether the Act's fundamental unconditional requirement for continuous emission limitations can be vitiated, threatening serious harm to communities. This Circuit should rehear this case *en banc* to restore order to its case law and uphold Congress's intent that people receive continuous protection against industrial emissions of harmful air pollutants.

## BACKGROUND

After this Court held exemptions are illegal, EPA began removing them from its rules. At issue here is EPA's action to further bring its regulations into compliance with the Act and this Court's precedent by removing complete affirmative defense provisions from its Title V permitting regulations.

Congress designed Title V of the Clean Air Act to facilitate enforcement of and compliance with air pollution control regulatory requirements. *See* Br. of Env't Resp't-Intervenors ("Ints.") 4-5; EPA's Answering Br. 4. Title V requires stationary sources of air pollution to obtain "comprehensive operating permit[s] to assure compliance with all emission limitations" that apply. *Env't Integrity Project v. EPA*, 425 F.3d 992, 993 (D.C. Cir. 2005).

In the 1990s, EPA inserted into its Title V regulations a complete affirmative defense against liability when a source exceeds emission limitations because of an "emergency." 57 FR 32,250, 32,306/2 (July 21, 1992) (codified at 40 C.F.R. § 70.6(g)); 61 FR 34,202, 34,239/2-3 (July 1, 1996) (codified at 40 C.F.R. § 71.6(g)).[1] Though not identical, emergencies and malfunctions are closely similar. Both are polluting events "beyond the control of a source" that result in enough pollution to exceed emission standards. 88 FR 47,029, 47,041/3 (July 21, 2023). The Title V affirmative defense is included in permits for many large polluting facilities nationwide. *See* Ints. 13.

Because they absolve polluters of liability for violations, affirmative defenses like these invite polluting sources to relax planning for emergencies, rather than improve management and oversight. *Id.* 9-10. In the Harris County, Texas,

---

[1] One regulatory provision governs states that issue their own Title V permits; the other governs EPA-issued Title V permits. They are substantively identical.

Attorney's Office's experience, "regulated entities treat affirmative defenses as if they were the rule rather than the exception." JA164; *see also* Ints. 10-12 (describing how affirmative defenses and exemptions hamper enforcement of emission limitations, thus providing incentives for facilities to invoke them instead of investing in approaches that could better reduce emissions).

Indeed, some facilities have regularly invoked the emergency affirmative defense at issue here, harming nearby communities and impeding effective enforcement of the Act. In Newark, New Jersey, for example, one power plant violated nitrogen oxide emission standards at least 34 times in eight years, and claimed the affirmative defense to avoid any consequences. Ints. 7-8. A Newark incinerator averaged over 50 violations per year for 16 years and invoked the affirmative defense dozens of times for emission limitation violations. *Id.* 8.

The impacts of uncontrolled emissions that can result from startup, shutdown, and malfunction events that facilities claim as emergencies can be grave. During these events, industrial facilities like refineries and power plants can release massive amounts of harmful air pollution over short periods of time, violate emission limitations in their permits, and severely harm nearby communities. *Id.* 5-9. The pollutants released can include known carcinogens, as well as pollutants that cause other serious health effects, like harming people's respiratory systems. *Id.* 6-8. In

Texas alone, excess emissions during these events cause an average of 35 deaths annually of people age 65 and older. *Id.* 5.

A robust record illustrates that affirmative defenses and exemptions block much Clean Air Act enforcement because the burden to overcome even a meritless invocation of such defenses is so overwhelming that would-be enforcers routinely find it imprudent to pursue enforcement cases. EPA itself has acknowledged that "affirmative defense provisions interfere with effective enforcement of [state plan] emission limitations." 80 FR 33,840, 33,870/1 (June 12, 2015). The Harris County Attorney's Office detailed its experience confronting an affirmative defense to civil penalties, concluding that "regulated industry seldom proffered the requisite documentation for their claims" and that "the overwhelming majority of affirmative defense claims were meritless." Ints. 10 (quoting JA162) (cleaned up). But, for the County, the practical "burdens" of even meritless invocations of that partial affirmative defense "deter[]" it "from pursuing relief in the courts." JA158. And one enforcement attorney has averred that the complexity that arises when a polluting source claims an exemption from emission limitations "makes it very difficult to bring a Clean Air Act citizen suit in a cost-effective manner." Ints. 11-12 (quoting JA138).

In 2023, EPA removed the Title V affirmative defense from its regulations. 88 FR 47,029. On judicial review, the panel reversed the agency's rescission. Op. 5-13.[2]

## ARGUMENT

## I. THE PANEL DECISION CONFLICTS WITH CIRCUIT PRECEDENT.

### A. The panel decision conflicts with *Sierra Club*, *U.S. Sugar*, and *Florida Electric*, as well as with precedent barring end runs around core statutory requirements.

This Court's precedent correctly holds that the Act's command that emission limitations be continuous prohibits exempting periods of operation from emission limitations. *Sierra Club*, 551 F.3d at 1027-28; *U.S. Sugar*, 830 F.3d at 607-08. Precedent further establishes that complete affirmative defenses at least "functionally" "create" exemptions from the governing emission-control requirement. *Florida Electric*, 94 F.4th at 114, 116. Perforce, when the governing rule is an emission limitation, complete affirmative defenses at least functionally create an exemption from the emission limitation. *Id.* 124 (Pillard, J., dissenting) ("like any other SSM exemption, [complete affirmative defenses] disrupt an emission limitation's continuity.").

---

[2] The panel decision wrongly says (at 5-6) Intervenors challenged Petitioner's standing. Intervenors' Brief was entirely silent on that issue and thus didn't dispute standing.

Thus, under these precedents, a complete affirmative defense is unlawful. But the panel decided otherwise. The panel decision doesn't find any functional difference between exempting sources from compliance with emission standards during periods of operation and providing complete affirmative defenses to liability for violating emission standards during such periods. *See* Op. 11-13. Instead, it relies entirely on a purported distinction between exemptions and complete affirmative defenses as "legal concepts" to find that even if a complete affirmative defense "allows a defendant to avoid liability," it does not formally suspend emission standards and, therefore, does not render the standards "non-continuous." *Id.*

The panel decision draws a distinction without a difference. Even if there were a relevant legal distinction between exemptions and this complete affirmative defense, *but see infra* pp.12-15 (exemptions, including under Clean Air Act, often function as affirmative defenses), the two are functionally identical and that's what matters. During any period when either an exemption or a complete affirmative defense spares a source from liability for exceeding emission standards, there is no consequence for exceeding a standard and no incentive to comply with it. The standard no longer "governs those events" in any meaningful sense of "govern." *Sierra Club*, 551 F.3d at 1028 (because "no section 112 standard governs [SSM] events—the SSM exemption violates the [Act's] requirement that some section 112 standard apply continuously"); *see SBC Commc'ns v. FCC*, 373 F.3d 140, 149-50

9

(D.C. Cir. 2004) ("'governed by' means 'to exert a determining or guiding influence in or over'"). That is why *Florida Electric* holds complete affirmative defenses to liability create exemptions from emission standards or are the functional equivalent of exemptions. 94 F.4th at 114, 116. Because exemptions for periods of operation and complete affirmative defenses for periods of operation are functional equivalents, they equally render emission standards discontinuous and conflict with *Sierra Club* and *U.S. Sugar*.

The panel decision's reliance on a formalistic distinction between an exemption and an affirmative defense to evade this conflict itself conflicts with binding precedent. The Supreme Court and this Court do not permit the use of empty or formalistic distinctions to make an end run around clear, fundamental statutory requirements. Substantive outcomes control instead.

For example, in *County of Maui v. Hawaii Wildlife Fund*, the Supreme Court rejected arguments that though the Clean Water Act prohibits discharges of water pollution from a pipe directly into navigable waters without a permit, the Clean Water Act's permit requirement would "not apply if there is any amount of groundwater between the end of the pipe and the edge of the navigable water." 590 U.S. at 178 (cleaned up). The Court "d[id] not see how Congress could have intended to create such a large and obvious loophole in one of the key regulatory innovations of the Clean Water Act." *Id.* 178-79. Instead, it held "the statute requires a permit

when there is a direct discharge from a point source into navigable waters or when there is the <u>functional equivalent of a direct discharge</u>." *Id.* 183.

Similarly, when EPA sought to extend Clean Air Act attainment deadlines, this Court rejected the agency's argument that, although the Act concededly barred EPA from "extending the attainment deadline at the <u>back</u> end of the attainment period," the Act allowed EPA to "extend[] the trigger date at the <u>front</u> end of the attainment period," which would result in the identical outcome—attainment deadlines extended to December. *NRDC*, 777 F.3d at 466-67. The attainment deadlines were "central to the regulatory scheme," and because the "substantive effect for the attainment deadlines" of either the front-end or back-end extension would be "precisely the same," the Court found "no reason to suppose that Congress" allowed one approach but prohibited the other. *Id.*

The Supreme Court applies the same functionalist rubric outside the environmental context. For instance, in *Apple Inc. v. Pepper*, it held that consumers could sue Apple for antitrust damages over certain purchases, for Apple's contrary antitrust "rule would elevate form…over substance." 587 U.S. at 283-84. The Court disagreed with Apple's arguments because they "would allow a monopolistic retailer to insulate itself from antitrust suits by consumers" and facilitate "a blatant evasion of statutory text and judicial precedent." *Id.* 285. The Court couldn't countenance

"furnish[ing] monopolistic retailers with a how-to guide for evasion of the antitrust laws." *Id.*

Yet, here, the panel decision uses a formalistic distinction between exemptions and complete affirmative defenses that function identically to avoid following *Sierra Club* and *U.S. Sugar*. Op. 11-12. The Act's command for continuously governing emission limitations is key to the statute's regulatory scheme, just like the requirements at issue in *County of Maui*, *NRDC*, and *Apple*. *See infra* pp.16-18 (explaining why panel decision is of exceptional importance). If the panel decision stands, it will formalize an end run around the Act's plain requirement that emission standards apply on a continuous basis by allowing the use of exemptions-by-another-name to permit compliance that is only intermittent. Rule 40's provision for *en banc* rehearing exists so the Court can correct panel rulings like this one, which conflict with prior decisions of this Court and drastically alter key statutory provisions.

## B. The panel decision's distinctions without differences lack merit.

The panel decision's attempts to elide the conflicts between itself and *Sierra Club* and *Florida Electric* (it is silent on *U.S. Sugar*) don't withstand scrutiny.

*Sierra Club*. The panel decision fundamentally relies (at 11-12) on drawing a bright-line distinction between complete affirmative defenses to liability and exemptions, but a substantial body of binding caselaw that the panel decision overlooks holds that distinction is illusory. *Cunningham v. Cornell University*, for

example, confirms that exemptions generally are simply a type of affirmative defense, such that the pleading burden for an exemption falls on defendants, not plaintiffs. 604 U.S. 693, 701-02 (2025) (citing *FTC v. Morton Salt Co.,* 334 U.S. 37, 44-45 (1948)). This Circuit has held the same: where "a statute or regulation…provides that certain acts are unlawful except in specific authorized scenarios," "the default rule for interpreting provisions with this structure is that an exception made by a proviso or other distinct clause designates an affirmative defense." *Palmer v. FAA*, 103 F.4th 798, 805 (D.C. Cir. 2024) (cleaned up). Further, the panel decision's assertion (at 11) that the affirmative defense doesn't "alter the underlying legal requirements" overlooks that the defense "is <u>in addition to</u> any emergency or upset provision contained in any applicable requirement," thus altering those requirements. 40 C.F.R. § 70.6(g)(5) (2022) (emphasis added).

To support its distinction between exemptions and complete affirmative defenses, the panel decision doesn't cite any authority from this Court or the Supreme Court. Instead, it relies entirely on a discussion in Wright & Miller of Federal Rule of Civil Procedure 8(c) and a general description of affirmative defenses in an out-of-circuit case where two of the three judges concurred only in the judgment. Op. 11-12; *see Wright v. Southland Corp.*, 187 F.3d 1287, 1306 (11th Cir. 1999) (Cox, J., specially concurring); *id.* (Hull, J., specially concurring). These authorities discuss the operation of affirmative defenses generally; they say nothing

13

about whether the type of complete affirmative defenses to liability at issue here is, or functions as, an exemption for the purpose of interrupting continuous compliance. Neither supports the panel decision's distinction, let alone the finding that complete affirmative defenses to liability for periods of operation comport with *Sierra Club* and the continuous compliance requirement.

Practice confirms that the general rule that an exemption <u>is</u> an affirmative defense to liability holds in Clean Air Act enforcement cases, including, notably, cases where a defendant invokes an outright exemption from emission limitations. Courts generally treat exemptions as defenses for defendants to raise and prove in Clean Air Act enforcement suits. *E.g.*, *Utah Physicians for a Healthy Env't v. Harley-Davidson of Salt Lake City*, 2:22-CV-00473-DBB-DAO, 2024 WL 3276844, at *18 (D. Utah July 1, 2024); *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 856 (S.D. Ohio 2003). The same holds when SSM exemptions are involved. For example, in a suit over tens of thousands of hours of self-reported violations of Clean Air Act § 111 emission standards, the defendant "raised two defenses to liability," one of which was that "excess emissions during periods of startup, shutdown and malfunction of process equipment were not violations." Jim Hecker, *The Difficulty of Citizen Enforcement of the Clean Air Act*, 10 Widener L. Rev. 303, 308 (2004). The defendant premised that defense on EPA regulations that codify, for purposes of standards under § 111, the same exemption as the regulation *Sierra Club* vacated,

which covered only standards under § 112. Precedent and practice thus both undermine the panel decision.

*Florida Electric*. To support its distinction between exemptions and complete affirmative defenses, the panel decision dismisses as *dictum Florida Electric*'s holding that complete affirmative defenses create exemptions or are "functionally exemptions." Op. 12-13. The panel decision describes *Florida Electric* as using the "exemptions" language "only to distinguish complete affirmative defenses from partial affirmative defenses—and to explain why the complete affirmative defenses did not encroach on the judiciary's power to choose appropriate penalties for a Clean Air Act violation." *Id.* 12.

That description underscores why the holding is not *dictum*, but necessary to *Florida Electric*'s result. Only by making clear that complete affirmative defenses at least functionally create an "exemption" from liability does *Florida Electric* find them different from partial affirmative defenses—and lawful under its analysis of automatic exemptions. 94 F.4th at 114 ("our automatic-exemption analysis applies equally to [complete affirmative defenses]"); *see id.* 99-104 (automatic-exemption analysis). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 67 (1996). Because *Florida Electric*'s finding that complete affirmative defenses create an exemption was necessary to the

15

result of that case, it is a holding. *See, e.g., id.*; *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) ("a necessary antecedent" to the court's decision is not dicta). Accordingly, the panel decision was "bound by" *Florida Electric*'s reasoning that complete affirmative defenses are functionally exemptions. *E.g., Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024).

## II. THE PANEL DECISION RAISES A QUESTION OF EXCEPTIONAL IMPORTANCE.

Congress placed requirements for emission limitations throughout the Clean Air Act, and the requirement that they be continuous is integral to fulfilling Congress's goal of clean air everywhere in the United States. Though the panel decision doesn't address other reasons complete affirmative defenses may be unlawful or arbitrary, it vitiates the Act's direct statutory requirement that emission limitations be continuous. The panel decision thus raises the question of whether one of the Act's central premises itself prohibits exemptions, however labeled, that severely harm public health. That question is exceptionally important.

Congress wrote the Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 144 (D.C. Cir. 2015) (quoting 42 U.S.C. § 7401(b)(1)). For more than 50 years, the Act has successfully reduced air pollution and alleviated health harms Americans experience

from breathing polluted air.[3] It has done so economically efficiently: its monetized

human health benefits have vastly exceeded its costs. *E.g.*, *Retrospective Report* at

ES-9; *Prospective Report* 2.

Key to its success, the Act requires EPA to promulgate numerous "emission

standards," "emission limitations," and "standards of performance." *E.g.*, 42 U.S.C.

§§ 7411(b)(1)(B), 7412(d)(1), (f)(2), 7429(a)(1)(A), (b)(1). Since 1977, the Act has

defined each of these terms as restrictions that apply "on a continuous basis." *Id.*

§ 7602(k), (*l*); *see Sierra Club*, 551 F.3d at 1027 (quoting House Report 92).

Congress revised the Act to require emission standards be continuous because it

studied the alternative, and concluded discontinuity wouldn't result in the air quality

improvements, economic growth, or technological advancements it intended the Act

to achieve. *See, e.g.*, House Report 87-88 (finding continuous emission reduction

necessary "to minimize pollution and to maximize the potential for long-term

economic growth" and helpful "to encourage the development of" the better, cheaper

"pollution control systems" the Act seeks); S. Rep. No. 94-717, at 78 (1976) (finding

"the only acceptable basic strategy is one based on continuous emissions control"

---

[3] *See, e.g.*, EPA, *The Benefits and Costs of the Clean Air Act, 1970-1990*, ES-3 to -6 (1997) ("*Retrospective Report*"), https://www.epa.gov/sites/default/files/2015-06/documents/contsetc.pdf; EPA, *The Benefits and Costs of the Clean Air Act from 1990 to 2020: Summary Report* 10-15 (2011) ("*Prospective Report*"), https://www.epa.gov/sites/default/files/2015-07/documents/summaryreport.pdf.

and that "continuous emission reduction measures are available, …reliable, and…economically justified").

Thus, Congress added the continuity requirement because it had learned that for the Act to deliver on its promise of clean air for Americans, polluters subject to emission limitations would have to control their pollution continuously. It found that "[w]ithout an enforceable emission limitation which will be complied with at all times, there can be no assurance that ambient standards will be attained and maintained." House Report 92. But, as explained above, the panel decision neutralizes that congressional decision about how to protect Americans from harmful air pollution. Whether an exemption that imperils public health can evade the Act's core prohibition on exemptions if simply labeled by another name is an exceptionally important question.

## CONCLUSION

The Court should rehear this case *en banc*.

Dated: October 20, 2025

Respectfully submitted,

*/s/ Seth L. Johnson*
Seth L. Johnson
Deena Tumeh
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 793-6482
(202) 745-5214
sjohnson@earthjustice.org
dtumeh@earthjustice.org
jpew@earthjustice.org

*Counsel for Sierra Club, Ironbound
Community Corporation, and California
Communities Against Toxics*

*/s/ Andrea Issod (with permission)*
Joshua Smith
Andrea Issod
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
joshua.smith@sierraclub.org
andrea.issod@sierraclub.org

*Counsel for Sierra Club*

*/s/ Sanghyun Lee (with permission)*
Sanghyun Lee
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, DC 20006
(202) 263-4441
slee@environmentalintegrity.org

*Counsel for Environmental Integrity
Project*

*/s/ John D. Walke (with permission)*
John D. Walke
Emily K. Davis
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense
Council*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with Federal Rules of Appellate Procedure 32(g)(1) and 40(d)(2), that the foregoing Environmental Respondent-Intervenors' Petition for Rehearing *En Banc* contains 3,892 words, as counted by counsel's word processing system, and thus complies with the 3,900 word limit. *See* Fed. R. App. P. 40(d)(3)(A).

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365** using **size 14 Times New Roman** font.

Dated: October 20, 2025

*/s/ Seth L. Johnson*
Seth L. Johnson

# ADDENDUM

1. Opinion from Which Rehearing Is Being Sought

2. Certificate as to Parties, Rulings, and Related Cases

3. Environmental Respondent-Intervenors' Rule 26.1 Disclosure Statement

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 14, 2025        Decided September 5, 2025

No. 23-1267

SSM LITIGATION GROUP,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

CALIFORNIA COMMUNITIES AGAINST TOXICS, ET AL.,
INTERVENORS

———

On Petition for Review of a Final Action
of the Environmental Protection Agency

———

*Russell S. Frye* argued the cause and filed the briefs for petitioner.

*Daniel R. Dertke*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Todd Kim*, Assistant Attorney General.

*Joshua Smith*, *Andrea Issod*, *Deena Tumeh*, *Seth L. Johnson*, *Patton Dycus*, *John D. Walke*, and *Emily K. Davis*

2

were on the brief for environmental intervenors in support of respondent.

Before: RAO and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Pollution control technology sometimes fails due to an emergency or other unforeseen event. During such emergencies, a stationary source of air pollution may exceed its emission limitations. For decades, the Environmental Protection Agency recognized this reality by providing an affirmative defense to liability for excess emissions caused by emergency events. In 2023, the agency rescinded the defense, concluding it was unlawful because it encroached on the judiciary's authority under the Clean Air Act to impose "appropriate civil penalties." 42 U.S.C. § 7604(a). In addition, EPA maintained the defense was unlawful because it could be construed as an exemption that rendered emission standards non-continuous in violation of the Clean Air Act.

In its petition for review, SSM Litigation Group argues EPA's rescission of the Title V affirmative defense was arbitrary and capricious because it rests entirely on erroneous legal justifications. We agree and therefore grant the petition.

I.

The Clean Air Act authorizes EPA to impose emission standards and limitations for various sources of air pollution, including factories and power plants. The Act defines an emission limitation as "a requirement … which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. § 7602(k). As relevant here,

3

EPA sets emission limitations based on the capabilities of pollution control technology. *See, e.g.*, *id.* §§ 7411, 7412. Title V of the Clean Air Act, enacted in 1990, establishes a permitting regime for facilities that emit air pollution. *Id.* §§ 7661 *et seq.* This regime "consolidate[d] existing air pollution requirements into a single document, the Title V permit." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 597 (D.C. Cir. 2016) (cleaned up).

All operators of stationary sources of air pollution are required to apply for and hold a Title V permit, which must list the "enforceable emission limitations and standards" applicable to the source under the Clean Air Act. 42 U.S.C. § 7661c(a); *see id.* § 7661a(a). If an operator violates the emission limitations and standards incorporated in its permit, the operator can be sued for injunctive relief and "any appropriate civil penalties." *Id.* § 7604(a); *see id.* § 7413(b). But the permit also creates a "shield" from liability that treats compliance with the permit's terms as compliance with applicable Clean Air Act requirements. *Id.* § 7661c(f).

Shortly after Congress enacted Title V, EPA promulgated regulations that created a narrow defense for stationary sources that exceed their emission limitations due to an emergency event. *See* 57 Fed. Reg. 32250, 32306 (1992) (establishing affirmative defense for holders of state-issued Title V permits); 61 Fed. Reg. 34202, 34239 (1996) (extending affirmative defense to holders of federally issued permits). These regulations created "an affirmative defense to an action brought for noncompliance with … technology-based emission limitations" during an emergency. 40 C.F.R. § 70.6(g)(2) (2022). The regulations defined an emergency as "any situation arising from sudden and reasonably unforeseeable events beyond the control of the source, including acts of God," that "causes the source to exceed a technology-based emission

4

limitation under the permit, due to unavoidable increases in emissions attributable to the emergency." *Id.* § 70.6(g)(1) (2022). To qualify for the defense, the permittee was required to prove that "[a]n emergency occurred," that the facility was "being properly operated," and that the permittee had taken "all reasonable steps" to minimize excess emissions during the emergency. *Id.* § 70.6(g)(3) (2022). If the defense applied, a permittee would not be found in violation of the Clean Air Act for exceeding its emission limitations. *Id.* § 70.6(g)(2) (2022).

For decades, EPA retained the Title V affirmative defense for emergencies. In 2016, however, EPA proposed rescinding the defense on the ground that it unlawfully encroached on the judiciary's role to impose "any appropriate civil penalties" for Clean Air Act violations. 42 U.S.C. § 7604(a); *see* 81 Fed. Reg. 38645, 38648–49 (2016) (discussing *NRDC v. EPA*, 749 F.3d 1055 (D.C. Cir. 2014)). In the alternative, EPA concluded the defense was unlawful because it operated as an exemption from otherwise applicable emission limitations, rendering those limitations non-continuous in violation of 42 U.S.C. § 7602(k). 81 Fed. Reg. at 38648 n.12 (discussing *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008)). EPA rescinded the defense in a final rule issued in 2023. 88 Fed. Reg. 47029, 47030–31 (2023).

SSM Litigation Group ("SSM"), a coalition of trade associations some of whose members operate stationary sources of air pollution and hold Title V permits, petitioned for review.

II.

We begin, as we must, with our jurisdiction. We have exclusive jurisdiction over petitions challenging "any … nationally applicable regulations promulgated, or final action taken, by the [EPA] Administrator." 42 U.S.C. § 7607(b). The

5

government and environmental intervenors maintain that SSM
has failed to demonstrate standing. Because SSM is an
association ultimately representing entities directly regulated
under Title V, we conclude it has standing to challenge the
rescission of the Title V affirmative defense.

A.

To demonstrate associational standing, "an organization
must show that (1) its members would otherwise have standing
to sue in their own right; (2) the interests it seeks to protect are
germane to the organization's purpose; and (3) neither the
claim asserted nor the relief requested requires the participation
of individual members in the lawsuit." *Int'l Dark-Sky Ass'n,
Inc. v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (cleaned
up). At the time SSM submitted its petition, the D.C. Circuit
Rules required a direct review petitioner to "set forth the basis
for the claim of standing" in its opening brief and, if standing
is not apparent from the administrative record, to establish
standing through "arguments and evidence."[1] D.C. Cir. R.
28(a)(7) (2024). In applying this rule, we have "allowed
petitioners to proceed if a reply brief fleshes out a timely raised
theory of standing and also makes standing patently obvious
and irrefutable." *Sierra Club v. U.S. Dep't of Energy*, 107 F.4th
1012, 1015 (D.C. Cir. 2024) (cleaned up).

B.

The parties do not dispute that the interests SSM seeks to
protect are germane to its purpose or that the claim asserted and
relief sought—reversal of a rule—do not require the

---

[1] D.C. Circuit Rule 28(a)(7) has since been amended, effective
August 11, 2025, to require all petitioners to include, in their opening
briefs, arguments and evidence establishing standing, regardless of
whether standing is apparent from the administrative record.

6

participation of individual members. *Int'l Dark-Sky Ass'n*, 106 F.4th at 1217. They disagree only over whether SSM has demonstrated, in accordance with our local rules, that it has members that would have standing to sue in their own right. We conclude SSM has made this showing.

SSM raised a straightforward theory of standing in its opening brief. It explained that it is a coalition of trade associations "whose members operate stationary sources of air pollution subject to operating permits issued under [Clean Air Act] Title V" and who were protected "under an affirmative defense provision" for emergencies. SSM Br. at 18. In other words, SSM's member associations have members that are directly regulated under Title V and that have been exposed to liability by EPA's rescission of the affirmative defense included in their permits. That injury is redressable by an order of this court setting aside the rescission regulation.

Neither EPA nor intervenors question that a holder of a Title V permit would have standing to sue if its permit included the affirmative defense. EPA argues only that SSM failed to provide evidence that it represents such permit holders. To be sure, SSM neglected in its opening brief to attach declarations from any member association, instead providing those declarations only in its reply brief. But that delay in providing evidence of standing is excusable because (1) the administrative record "went a long way toward showing standing"; (2) the reply brief declarations did not raise a new theory of standing and made standing "patently obvious"; and (3) EPA "suffered no prejudice" from the delay. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 112 (D.C. Cir. 2021).

First, when filing its petition, SSM reasonably concluded the administrative record was sufficient to establish its standing. As SSM pointed out in its opening brief, numerous

7

commenters in the rulemaking process raised a similar theory of injury caused by the rescission of the affirmative defense. *See, e.g.*, J.A. 55 (comment by Ohio Chemistry Technology Council, et al., explaining its "members are subject to regulation by Ohio's … fully-approved Title V operating permit program, and have a direct and substantial interest in the action proposed by EPA"); J.A. 59 (comment by a trade association explaining its "members own and operate manufacturing facilities … affected by the proposed change in the operating permit program regulations because they are required to have [Clean Air Act] operating permits"). At the time SSM filed its petition, Circuit Rule 28(a)(7) required evidence of standing only when standing was "not apparent from the administrative record." D.C. Cir. R. 28(a)(7) (2024). But the record here demonstrates that directly regulated Title V permit holders are injured by the rescission—an entirely obvious and straightforward theory of standing.

SSM's reliance on the administrative record in its opening brief was reasonable, particularly because the requirement that an association identify specific members is most salient when an association represents third parties who are not directly regulated. *See, e.g.*, *Sierra Club v. EPA*, 292 F.3d 895, 901–02 (D.C. Cir. 2002) (evaluating whether individuals had standing to challenge rule regulating facilities generating or treating toxic wastewater); *Chamber of Commerce v. EPA*, 642 F.3d 192, 200–10 (D.C. Cir. 2011) (evaluating whether automobile dealers had standing to challenge rule regulating automobile manufacturers); *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 613–14 (D.C. Cir. 2019) (evaluating whether retirees had standing to challenge rule regulating investment funds). SSM asserted its members represent directly regulated Title V permit holders, and the explanation of why such directly regulated entities have standing is clearly established by the administrative record.

8

Second, although SSM did not identify specific regulated entities in its opening brief, it provided the necessary declarations in its reply brief, which "ma[de] standing patently obvious and irrefutable." *Dep't of Energy*, 107 F.4th at 1015 (cleaned up). In its reply brief, SSM attached declarations from member associations that corroborated its original theory of standing. For example, the American Chemistry Council attested that it is part of SSM and that its members "have facilities required to have an operating permit under Title V of the Clean Air Act," some of which "are located in states that had approved state Title V permitting programs that contained Title V affirmative defense provisions." Reply Br., Ex. B., Decl. of Dr. Kimberly White. The American Forest and Paper Association attested to similar facts. *See* Reply Br., Ex. A, Decl. of Timothy Hunt (attesting the Title V affirmative defense "had been either stated in or incorporated by reference in" the Title V permits "that some or all" of the associations' members' are required to have). These declarations make standing patently obvious and irrefutable because they confirm that the facilities SSM ultimately represents are "object[s] of the action (or forgone action) at issue." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

At oral argument, EPA suggested the reply brief declarations were deficient because they failed to name individual facilities. Our precedents are clear, however, that "anonymity is no barrier to standing on this record" because SSM's members are "directly regulated by the … [r]ule" and naming them would "add[] no essential information bearing on the injury component of standing." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (cleaned up). EPA does not, and cannot, maintain that a directly regulated facility protected by the affirmative defense lacks standing to challenge its rescission. And there is no serious dispute that SSM's reply brief

9

declarations—made under penalty of perjury—establish that SSM represents such facilities.

Finally, because SSM's standing is irrefutable and the reply brief declarations merely bolster its original theory of standing, EPA "was not prejudiced by its inability to respond to the supplemental declarations." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004); *see also Dep't of Energy*, 107 F.4th at 1015 (same). We may consider these reply brief declarations, which conclusively establish that SSM has associational standing.

III.

On the merits, we conclude EPA's rescission of the affirmative defense was not reasonably explained and not in accordance with law. *See* 42 U.S.C. § 7607(d)(9)(A) (authorizing reviewing court to "reverse any … action found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1064 (D.C. Cir. 1995) (explaining the Clean Air Act's standard of review "is essentially the same" as that of the Administrative Procedure Act). The agency justified its rescission exclusively on legal grounds, asserting the Title V affirmative defense was unlawful for two alternative reasons. First, EPA primarily maintained the affirmative defense encroached on the judiciary's statutory authority to assess civil penalties. In the alternative, EPA stated the defense functioned as an exemption that rendered emission limitations non-continuous in violation of the Clean Air Act. Because the

10

agency's rescission regulation was premised entirely on erroneous legal justifications, it must be reversed.

A.

EPA justified its rescission of the Title V affirmative defense primarily on the ground that the defense unlawfully encroached on the judiciary's role under the Clean Air Act to assess penalties for violations of emission limitations. *See* 88 Fed. Reg. at 47030–34. EPA based this conclusion on *NRDC v. EPA*, which held that a partial affirmative defense to monetary penalties unlawfully restricted the judiciary's statutory authority to impose "appropriate civil penalties." 749 F.3d at 1063 (quoting 42 U.S.C. § 7604(a)). EPA now concedes—and the environmental intervenors largely do not dispute—that the primary rationale for the rescission has been foreclosed by our intervening decision in *Environmental Committee of Florida Electric Power Coordinating Group, Inc. v. EPA*, 94 F.4th 77 (D.C. Cir. 2024) ("*Florida Electric*").

In *Florida Electric*, we clarified the critical distinction between a true affirmative defense that operates as a complete defense to Clean Air Act liability—as does the Title V defense for emergencies—and an affirmative defense that merely "precludes certain remedies after a source has violated an emission rule." *Id.* at 114. The latter is better understood as a limitation on remedies. *Id.* at 86 (discussing different types of affirmative defenses). Under the Clean Air Act, the EPA has no authority to create a regulatory "defense" that limits the remedial authority granted by Congress to the federal courts. *Id.* at 114–15. But a complete affirmative defense, like the one at issue here, is permissible because it relates to the antecedent question of liability and therefore does not impinge on the judiciary's authority to award "appropriate civil penalties." 42 U.S.C. § 7604(a).

11

Because the Title V affirmative defense is a complete defense to liability, not a limitation on judicial remedies, EPA's primary rationale for its rescission was erroneous.

## B.

EPA and the environmental intervenors also defend the rescission regulation on the ground that the Title V affirmative defense is effectively an exemption from applicable emission limitations and therefore renders those limitations not "continuous" in violation of the Clean Air Act, as interpreted by this court in *Sierra Club v. EPA*, 551 F.3d at 1027–28. This rationale finds no support in the Clean Air Act or *Sierra Club*.

The Clean Air Act requires EPA to establish emission standards. *See, e.g.*, 42 U.S.C. § 7412(d). And the Act defines an emission standard or limitation as a requirement that "limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis*." *Id.* § 7602(k) (emphasis added). Reading these provisions together in a case involving section 112 standards, we interpreted the Clean Air Act to require "that some section 112 standard apply continuously." *Sierra Club*, 551 F.3d at 1028. We held that a regulation that expressly lifted section 112 standards during periods of startup, shutdown, and malfunction was contrary to the Act. *Id.*

The reasoning of *Sierra Club*, however, does not support EPA's contention that the Title V affirmative defense is unlawful. The agency's argument conflates two distinct legal concepts: an affirmative defense to liability and an *ex ante* exemption from an emission standard. An affirmative defense allows a defendant to avoid liability, but it does not alter the underlying legal requirements.[2] *See* Wright & Miller, 5 Fed.

---

[2] The concept of an affirmative defense derives from the common law pleading device known as confession and avoidance. *See*

12

Prac. & Proc. Civ. § 1270 (4th ed. updated May 2025). The very concept of an affirmative defense assumes that a legal standard remains in force, because otherwise there would be no claim—and no need for an affirmative defense. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1303 (11th Cir. 1999) ("An affirmative defense is generally a defense that, if established, requires judgment for the defendant even if the plaintiff can prove his case."). Unlike the regulatory exemption in *Sierra Club*, which suspended emission standards during certain times, the Title V affirmative defense for emergencies does not lift applicable standards. Because the emission standards are never lifted, they apply "on a continuous basis" as required by the Clean Air Act. 42 U.S.C. § 7602(k).

EPA leans on the fact that in *Florida Electric* we described complete affirmative defenses as "creat[ing] an exemption from the normal emission rule" and as "functionally exemptions." 94 F.4th at 114, 116. Those descriptions, however, were necessary only to distinguish complete affirmatives defenses from partial affirmative defenses—and to explain why the complete affirmative defenses did not encroach on the judiciary's power to choose appropriate remedies for a Clean Air Act violation. *Id.* at 114. We did not otherwise collapse the legal distinction between an affirmative defense and an *ex ante* exemption from a legal standard. And, as EPA acknowledges in its brief, *Florida Electric* did not reach the question of whether a complete affirmative defense

---

Shipman, Common-Law Pleading § 166, p. 299–301 (3d ed. 1923). Confession and avoidance contrasts with demurrer, which is an assertion that a claim is legally insufficient on its own terms. *See id.* §§ 146–47, p. 277–79. Today, litigants make such insufficiency assertions through a motion to dismiss, Fed R. Civ. P. 12(b)(6), whereas affirmative defenses must typically be raised in a responsive pleading, Fed R. Civ. P. 8(c)(1).

13

would render an emission limitation non-continuous in violation of the Clean Air Act. *See id.*; EPA Br. at 40.

Squarely presented with that question, we now hold that a complete affirmative defense to liability does not render an emission limitation non-continuous under 42 U.S.C. § 7602(k). EPA therefore cannot justify its rescission of the Title V affirmative defense on the ground that it renders emission limitations non-continuous.

\* \* \*

EPA rescinded a thirty-year-old affirmative defense on the ground that it was unlawful under the Clean Air Act. EPA's reasoning, however, cannot be squared with the text of the Clean Air Act or our precedents. Because EPA offered no independent policy rationale, its rescission regulation was unreasonable and not in accordance with law. We therefore grant the petition and reverse the rescission.

*So ordered*.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 28(a)(1) and 40(c), Environmental Respondent-Intervenors Sierra Club, Ironbound Community Corporation, California Community Against Toxics, Environmental Integrity Project, and Natural Resources Defense Council submit this certificate as to parties, rulings, and related cases.

## (A) Parties and *Amici*

### (i) Parties, Intervenors, and *Amici* Who Appeared in the District Court

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

### (ii) Parties to This Case

<u>Petitioners</u>: SSM Litigation Group

<u>Respondents</u>: United States Environmental Protection Agency

<u>Respondent-Intervenors</u>: Sierra Club, Ironbound Community Corporation, California Community Against Toxics, Environmental Integrity Project, and Natural Resources Defense Council.

### (iii) *Amici* in This Case

None at present.

### (iv) Circuit Rule 26.1 Disclosures

See Respondent-Intervenors' disclosure statement below.

**(B) Rulings Under Review**

Petitioner seeks review of EPA's final rulemaking titled *Removal of Title V Emergency Affirmative Defense Provisions from State Operating Permit Programs and Federal Operating Permit Program*, published at 88 FR 47,029, on July 21, 2023.

**(C) Related Cases**

Respondent-Intervenors are not aware of any related cases.

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 40(c), Sierra Club, Ironbound Community Corporation, California Community Against Toxics, Environmental Integrity Project, and Natural Resources Defense Council state that they are non-governmental organizations with no parent corporation. No publicly held corporation owns 10% or more of any organization's stock. The general nature and purpose of each organization is as follows:

Sierra Club, organized and existing under the laws of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

Ironbound Community Corporation, organized and existing under the laws of New Jersey, provides social services and advocates to address environmental issues impacting residents of Ironbound, a neighborhood of Newark, New Jersey.

California Communities Against Toxics, organized and existing under the laws of California, is an environmental justice network that aims to reduce exposure to pollution to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm.

Environmental Integrity Project, organized and existing under the laws of

the District of Columbia, is a national nonprofit organization that advocates for more effective enforcement of environmental laws.

National Resources Defense Council, organized and existing under the laws of New York, is a national nonprofit organization dedicated to protecting the environment.

Dated: October 20, 2025

Respectfully submitted,

/s/ Seth L. Johnson
Seth L. Johnson
Deena Tumeh
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 793-6482
(202) 745-5214
sjohnson@earthjustice.org
dtumeh@earthjustice.org
jpew@earthjustice.org

Counsel for Sierra Club, Ironbound
Community Corporation, and California
Communities Against Toxics

/s/ Sanghyun Lee (with permission)
Sanghyun Lee
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, DC 20006
(202) 263-4441
slee@environmentalintegrity.org

Counsel for Environmental Integrity
Project

/s/ Andrea Issod (with permission)
Joshua Smith
Andrea Issod
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
joshua.smith@sierraclub.org
andrea.issod@sierraclub.org

Counsel for Sierra Club

/s/ John D. Walke (with permission)
John D. Walke
Emily K. Davis
1152 15th Street NW, Suite 300
Washington, DC 20005
jwalke@nrdc.org
edavis@nrdc.org
(202) 289-6868

Counsel for Natural Resources Defense
Council